08-3886-cv
Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Authority

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2008

Heard: December 23, 2008                    Decided: May 29, 2009)

Docket No. 08-3886-cv

- - - - - - - - - - - - - - - - - - - - - - - -
BRIDGEPORT AND PORT JEFFERSON STEAMBOAT
COMPANY, FRANK C. ZAHRADKA, and D & D
WHOLESALE FLOWERS, INC.,
          Plaintiffs-Appellees,

                    v.

BRIDGEPORT PORT AUTHORITY,
          Defendant-Appellant.
- - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN and SACK, Circuit Judges.[*]

     Appeal from the July 8, 2008, judgment of the United States District Court for the District of Connecticut (Christopher F. Droney, District Judge), declaring a fee imposed on ferry passengers unconstitutional under the Commerce Clause and the Tonnage Clause, and

---

     [*]Honorable Guido Calabresi, originally a member of the panel, recused himself before oral argument, and the appeal is being decided by the remaining panel members, who are in agreement. See 2d Cir. R. § 0.14(b).

enjoining collection of the fee until revised.

Affirmed.

Timothy F. Noelker, St. Louis, Mo.,
(James W. Erwin, Ryan K. Manger,
Thompson Coburn LLP, St. Louis, Mo.;
Richard L. Rose, Everett E. Newton,
Murtha Cullina LLP, Stamford, Conn.,
on the brief), for Defendant-
Appellant.

Martin Domb, New York, N.Y. (Jeremy A.
Shure, Jordan M. Smith, Akerman
Senterfitt LLP, New York, N.Y.;
Jonathan S. Bowman, Stewart I.
Edelstein, Cohen and Wolf, P.C.,
Bridgeport, Conn., on the brief), for
Plaintiffs-Appellees.

(Steven E. Bers, Whiteford, Taylor &
Preston LLP, Baltimore, Md. for
amicus curiae Nat'l Ass'n of
Passenger Vessel Owners, Inc., in
support of Plaintiffs-Appellees.)

JON O. NEWMAN, Circuit Judge.

This appeal concerns the constitutionality of a fee imposed on passengers traveling by ferry from Bridgeport, Connecticut, across Long Island Sound to Port Jefferson, New York. The fee is alleged to violate the Commerce Clause, the constitutional right to travel, and the rarely litigated Tonnage Clause, as well as federal and state statutes. The Defendant-Appellant Bridgeport Port Authority ("BPA") appeals from the July 8, 2008, judgment of the District Court for the

-2-

District of Connecticut (Christopher F. Droney, District Judge), in a suit brought by the Plaintiffs-Appellees Bridgeport & Port Jefferson Steamboat Company (the "Ferry Company"), D & D Wholesale Flowers, Inc. ("D&D"), and Frank Zahradka. Greg Rose, the owner of D & D, and Zahradka are regular ferry passengers. The judgment declared the fee unconstitutional under both the Commerce Clause and the Tonnage Clause, enjoined its collection, and awarded nominal damages to the Ferry Company and modest damages to D&D. We affirm.

Background

The BPA. The BPA is a quasi-public entity created in 1993, pursuant to a state statute that authorizes Bridgeport to establish a port authority, see Conn. Gen. Stat. § 7-329a, and the City of Bridgeport Municipal Code. The Municipal Code gives broad definition to the BPA's purposes, which include "to foster and stimulate the shipment of freight and commerce through the ports," "to develop and promote port facilities with the district in order to create jobs, increase the city's tax base and provide special revenues to the city," and to work with the City "to maximize the usefulness of available public funding." The BPA's independent auditors' report also describes the BPA's purposes broadly, including "to develop strategies and initiatives to promote and create port facilities within the district, [and] participate in the economic development of

-3-

the harbor and waterfront areas."

The BPA has jurisdiction over a geographic area known as the Port District.  The Port District extends approximately 1,000 feet inland from the waterways of Bridgeport Harbor, Black Rock Harbor, and their navigable waters and tributaries, excluding residential property and park lands.  The BPA also has jurisdiction over certain lands outside the 1,000-foot limit.  Located within the Port District are the Water Street Dock (the "Dock"), the Cilco Shipping Terminal, the 50-acre Steel Point Peninsula, and the 48-acre Bridgeport Regional Maritime Complex ("BRMC"), which includes the Derecktor Shipyard.

The BPA is directed by a five-member Board of Commissioners, three of whom are appointed by the mayor of Bridgeport and two of whom serve by virtue of their positions as the City's Director of Economic Development and Harbor Master.  The BPA is managed by an executive director and staff.

When the BPA was created in 1993, the City of Bridgeport transferred control over the Dock to the BPA under a property management agreement.  The Dock facilities were in very poor condition prior to the BPA's existence.  The Harbor Master at the time described them as "deplorable"; "[t]he dock was just a [mishmash] of steel plates over various holes, rotted timbers. . . . At night, . . . the place was just a haven for people breaking into cars, prostitution."

At that time, the terminal consisted of a concrete block building that housed two poorly maintained restrooms and a small office. There were no food facilities or other concessions and no waiting areas for passengers.

With government grant money, the BPA built a new ferry terminal, which was completed in 1996. The District Court found that the new terminal building was "a dramatic improvement from the preexisting structure." It had two floors: the ground floor had a public waiting area, restrooms, information counter, cafeteria, and small office; the second floor, which was not open to the public, housed the BPA and the offices of the Connecticut World Trade Association, a reception area, conference room, and several other offices.

Since its inception, the BPA has obtained government grants to fund many other development projects in the Port District that have contributed to the revitalization of the area.

<u>Passenger plaintiffs.</u> Rose and Zahradka were recruited to be plaintiffs in this case by the Ferry Company's vice-president and general manager Frederick Hall.[1] The Ferry Company paid the legal fees and expenses for both individuals.

---

[1]Zahradka withdrew his claim for past damages but remains a plaintiff for purposes of prospective relief.

The Ferry Company. The Ferry Company is a privately owned company that has been providing vehicle and passenger ferry service between Bridgeport and Port Jefferson since 1883. Its president, Brian McAllister, has owned a 100 percent interest in the Ferry Company since 1980. Currently, the Ferry Company owns and operates three ferry boats. In 2005, the Ferry Company transported approximately 460,000 vehicles and one million passengers.

On the Port Jefferson side, the Ferry Company owns most of the dock and terminal facilities and provides all ferry-related services. Neither the Ferry Company nor its passengers pay a user fee to any government agency in Port Jefferson.

On the Bridgeport side, however, the Ferry Company does not own the dock or terminal facilities. Until 1993, the Ferry Company leased the use of the Dock from the City of Bridgeport. When the City transferred control of the Dock to the BPA, the Ferry Company entered a lease to rent the Dock from the BPA at an annual rate, which was $100,000 for the first year and increases to $158,956 through 2011.

The lease agreement entitles the Ferry Company to "non-exclusive preferential use" of the Dock. The BPA reserved for itself all other uses of the Dock and the premises, except for the following: operation of the food concession, which was the subject of another agreement between the parties; use of office and waiting room space in the two-

-6-

story terminal building that the BPA "may from time-to-time make available"; and use of a few parking spaces for Ferry Company employees.

Before and after the creation of the BPA, the Ferry Company has been responsible for running daily ferry operations at the Dock. The Ferry Company employs a Dock Manager and a staff of 15 to 22 to handle all docking and undocking of ferries, staging of vehicles on the roadway to board, directing passengers and vehicles on and off the ferries, shuttling passengers to and from the parking lots, and removing snow on the Dock. Ferry Company employees also perform security functions at the Dock.

The passenger fee. Since its inception in 1993, the BPA has imposed a passenger fee on all persons and vehicles embarking on, or disembarking from, the Ferry Company ferries at the Dock. The amount of the fee varies depending on whether the passenger is a person, a car, a truck, or a bus. In 1993, the fee for an adult foot passenger was 50¢ and for a vehicle, $1.00. In 2003, the fee for an adult foot passenger was $1.00 and for a vehicle including a driver, $2.00. In February 2006, the BPA began assessing a one-dollar surcharge to cover the BPA's fees and costs in this litigation.

The fee is a relatively a small portion of the total ferry ticket price. For example, in 2005, a one-way ferry ticket for a vehicle

-7-

with unlimited passengers was $51.25, while the corresponding passenger fee was $2.75. The fee is added to the ticket price and collected by the Ferry Company on behalf of the BPA at the time passengers purchase their ferry tickets on board.[2] For this service, the BPA pays the Ferry Company an administrative fee, which was $22,500 per year until May 2003 when it was increased to $32,500. After retaining its administrative fees, the Ferry Company remits the proceeds of the passenger fee to the BPA on a monthly basis, along with a written report of the number of tickets sold and the amounts collected from each type of passenger.

The BPA's revenue and expenses. From 1993 to 2004, the BPA collected a total of approximately $9.5 million in passenger fees and more than $1 million in rental revenues from the lease agreements with the Ferry Company and its food concession subsidiary. The passenger fee and ferry leases are almost the sole source of operating revenue for the BPA. Until 2002, the passenger fee and lease revenue exceeded the total operating expenses of the BPA. As the District Court noted,

---

[2]The Ferry Company has refused to collect the $1 litigation surcharge on the BPA's behalf, and the BPA has hired a firm to collect the surcharge directly from passengers embarking or disembarking from the ferry.

"[T]he total amount of Passenger Fees collected alone from 1993 to 2004 correlates very closely with the Port Authority's total operating expenses during the same period." The BPA's executive director admitted that the BPA has used the revenue from the passenger fee and the Dock lease to pay for essentially all of its operating expenses, including all salaries, health benefits, pension payments, payroll taxes, telephone, utilities, office equipment, travel, charitable contributions, and automobile and lease expenses.

The District Court's decision. The District Court, relying on the Supreme Court's so-called "dormant" Commerce Clause jurisprudence, see United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Management Authority, 550 U.S. 330, 338 (2007), endeavored to apply the test the Supreme Court has set forth for determining the constitutionality of fees imposed by governmental entities to defray the costs of facilities used by those engaged in interstate commerce. The test was first announced in Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc., 405 U.S. 707 (1972), involving an airport user fee imposed on commercial airlines. The Supreme Court stated that

> a charge designed only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance may constitutionally be imposed . . . so long as the toll is based on some fair approximation of use or privilege for use . . . and is

-9-

> neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred.

Id. at 714, 716-17.

In Northwest Airlines, Inc. v. County of Kent, 510 U.S. 355 (1994), the Supreme Court reformulated its Evansville standard into a three-pronged test. "[A] levy is reasonable under Evansville if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." Id. at 369.

In the pending case, the District Court ruled that the third criterion was satisfied because the passenger fee did not distinguish between intrastate and interstate travel. However, the Court ruled that the fee did not meet either the first or second Evansville criteria.

The Court stated that the fee was not based on a fair approximation of the ferry passengers' use of the port facilities because it was "calculated according to a method which ensures the Passenger Fee revenue will cover all of the Port Authority's operating costs and development projects throughout the Port District," and "many" of the "Port District activities funded by the fee are not even available to the ferry passengers (such as Derecktor, BRMC, harbor dredging, the barge feeder service, and the foreign trade zone)."

-10-

The Court also ruled "that the Passenger Fee is excessive in comparison with the government benefit conferred and in relation to the costs incurred by the taxing authority." Distinguishing the airport user fee upheld in Evansville, the Court stated that "the vast majority of airport development is intended to benefit the passengers traveling on airplanes leaving the airport, or to facilitate their air travel; the Port District, however, includes many projects beyond the Dock that are not functionally related to the ferry operation, and are not intended to benefit the travelers on ferries, or to facilitate their boat travel from Connecticut to Long Island."

To determine whether the revenue from the Passenger Fee was unreasonably high compared to the benefits that the BPA provided to the ferry passengers, the District Court examined separately each activity of the BPA. The Court concluded that the following BPA activities benefitted ferry passengers: (1) construction and maintenance of a new ferry terminal building, (2) repair of the bulkhead of the Dock, (3) construction of the access road, (4) planning of the parking facility for ferry passengers, (5) security for the Dock, and (6) daily operations related to the ferry.

On the other hand, the Court found that the following activities did not benefit ferry passengers: (1) development projects on Steel Point Peninsula; (2) development projects on the BRMC and the leasing

-11-

of a portion of the BRMC to Derecktor Shipyards; (3) establishing a high-speed ferry from Bridgeport to Stamford and New York City; (4) developing a barge-feeder service that would ship containers by barge from the Port of New York and New Jersey to Bridgeport; (5) operating a foreign trade zone in Bridgeport; (6) activities at the Cilco commercial shipping terminal located on land near the BRMC; (7) dredging the Bridgeport harbor; (8) operating a complimentary pump-out service for pleasure boats; (9) BPA review of other projects within the Port District; and (10) some miscellaneous activities, including payment of attorneys to register a new trademark for the BPA and purchasing season tickets to local minor league teams.

Having made this analysis of the BPA's expenditures, the Court determined that the passenger fee revenue collected by the BPA substantially exceeded the amount of money spent by the BPA for those activities that benefitted the ferry passengers. That determination led the Court to conclude that the fee violated the Commerce Clause and the constitutional right to travel, which the parties agreed was subject to the same standards applicable to the Commerce Clause.

The Court also concluded that the excessive nature of the fee, in relation to benefits conferred, rendered the fee in violation of the Tonnage Clause, which provides that "[n]o State shall . . . lay any Duty of Tonnage." U.S. Const. art. I, § 10, cl. 3. The Court noted

that the Supreme Court in <u>Clyde Mallory Lines v. Alabama</u>, 296 U.S. 261, 265-66 (1935), held that the prohibition on all "charge[s] for the privilege of entering, trading in, or lying in a port" did not extend to "charges . . . for services rendered to and enjoyed by the vessel." The District Court concluded that the passenger fee violated the Tonnage Clause of the Constitution because it was "used for the impermissible purpose of raising general revenues and for projects which do not and could not benefit the ferry passengers." The passenger fee revenue "fund[ed] projects completely unrelated and unavailable to the fee payers, such as negotiations, legal fees, and development proposals for the BRMC, Derecktor, the foreign trade zone, the barge feeder service, harbor dredging, and the high-speed ferry." As such, it was an impermissible fee of tonnage.[3]

Turning to the appropriate remedy, the District Court first determined that, although the Ferry Company could have suffered an economic loss quantifiable in damages, the Ferry Company had failed to provide any non-speculative evidence of its damages. The Court then found that the passenger plaintiff D & D was entitled to $494.63, based on the extent to which the passenger fee revenue was excessive

---

[3]The District Court rejected the plaintiffs' claims under federal and state statutes, and those claims are not pursued on this appeal.

compared to the benefits to ferry passengers. Finally, the Court ruled that the plaintiffs were entitled to an injunction prohibiting the BPA from collecting a passenger fee in an amount that exceeded what was necessary to pay for benefits to the ferry passengers.

Discussion

I. Standing

Initially, we consider the BPA's contention that the Ferry Company lacks standing because it failed to show injury-in-fact. Incorrectly assuming that injury-in-fact requires quantifiable damages, the BPA argues that because the district court did not award the Ferry Company any compensatory damages, it suffered no injury. But as this Court explained in Ross v. Bank of America, 524 F.3d 217 (2d Cir. 2008), lack of compensatory damages "does not negate standing." Id. at 222 (internal quotation marks omitted).

As the Ferry Company argued, it sustained injuries in the following respects:

(1) The added cost to its passengers reduces both demand for ferry services and the Ferry Company's revenue. Although the District Court found that the Ferry Company failed to present sufficient evidence to establish quantifiable damages, the Court noted that "[i]t is undisputed that the price elasticity for the ferry service is greater than zero but less than one, indicating on a theoretical level

-14-

that a change in price at a given point in time would lead to slightly decreased demand."

(2) The fee requirement obliges the Ferry Company, as a practical matter, to collect the passenger fee and remit the proceeds to the BPA.

(3) The Ferry Company adequately pleaded that its individual rights under the Commerce Clause are being violated. See Dennis v. Higgins, 498 U.S. 439, 449 (1991) (noting that the Commerce Clause creates an individual right); see also Boston Stock Exchange v. State Tax Commission, 429 U.S. 318, 320 n.3 (1977).

(4) The Ferry Company adequately alleged that it is exposed to future injury, which would entitle it to injunctive relief.

The Ferry Company also satisfies the requirements of prudential standing because (a) it sustained its own injury and thus asserts its own rights, not those of the passengers, (b) it does not assert a general grievance, in view of its special relationship with its customers, and (c) it operates an interstate ferry service and thus falls within the zone of interest protected by the Commerce Clause.

The BPA's challenge to the Ferry Company's standing is without merit.

II. Commerce Clause

The parties do not dispute that the passenger fee satisfies the

-15-

first prong of the Evansville test; the fee does not discriminate against interstate commerce. The BPA contends, however, that the fee is based on a fair approximation of the ferry passengers' use and that it is not excessive in relation to the benefits conferred on them. In this case, the "fair approximation" and the "excessiveness" criteria substantially overlap. The reason is that the passenger fee supports virtually the entirety of the BPA's operating budget. If, as the District Court ruled, some of the BPA's expenses confer no benefit on the ferry passengers, either enjoyed or available to be enjoyed, then to that extent the fee, imposed solely on ferry passengers, is not a fair approximation of the use of the facilities supported by the fee and is also excessive in relation to the benefits enjoyed or available to be enjoyed by the passengers.

The BPA correctly argues that there need not be a perfect fit between the use of the facilities and the support of those facilities by the fee, see United States v. Sperry Corp., 493 U.S. 52, 60 (1989) ("This Court has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services."), but the discrepancy here exceeds permissible bounds. The point emerges from a comparison of the airport cases with this case. In Evansville, embarking commercial airline passengers were the only payers of the user fees at issue–other classes of passengers (and non-

-16-

passengers) were exempt. The Court concluded that those commercial airline passengers reasonably bore that share of airport costs because it was they who enjoyed the principal benefit of "facilities built primarily to meet [their] needs." 405 U.S. at 718-19. Furthermore, although the airlines did not use every facility located anywhere in the airport (for example, the lounges for v.i.p. airlines passengers), the benefit derived from having the entire airport operating made a fee based on airline traffic into the airport reasonable. Similarly, in Alamo Rent-a-Car, Inc. v. Sarasota-Manatee-Airport Authority, 906 F.2d 516 (11th Cir. 1990), the operation of the airport provided a benefit to the car rental company located near, but unlike some of its competitors, not at, the airport, and the Eleventh Circuit therefore rejected the company's claim that it should be charged only for use of the road leading from its location to the airport. See id. at 519.

By contrast, in the pending case, the Port District is not a facility whose existence and entire operation benefit the ferry passengers. The BPA is a governmental unit created to accomplish a variety of tasks, only some of which afford actual or potential benefits to ferry passengers. Had the Dock and some of the related activities been operated directly by the City of Bridgeport, it could not be seriously maintained that a passenger fee could be used to pay a portion of Bridgeport's school or welfare expenses. The limits of

-17-

both a fair approximation of use and excessiveness are plainly exceeded when the fees support a BPA budget that includes, for example, a development project for reducing traffic on I-95, the interstate highway running generally along the Connecticut shore. No doubt those ferry passengers who drive to or from the Dock along I-95 are grateful for any reduction in traffic, but they would be equally grateful for whatever steps the BPA or the City of Bridgeport might take to reduce air pollution or otherwise improve the environment along I-95. Such quality-of-life improvements cannot be said to confer an actual or potential benefit to the ferry passengers as users of the ferries and thus exceed the bounds of what may reasonably serve as the basis for the BPA's fee.

A user fee, however, may reasonably support the budget of a governmental unit that operates facilities that bear at least a "functional relationship" to facilities used by the fee payers. See Automobile Club of New York, Inc. v. Port Authority, 887 F.2d 417, 421 (2d Cir. 1989). In that case, this Court held that a "functional relationship" existed between the Port Authority's cross-river PATH train and its bridges and tunnels (Lincoln Tunnel and Holland Tunnel), justifying inclusion of the PATH in the rate base of the tolls that the Port Authority charged on its bridges and tunnels, and rendering the tolls "just and reasonable" under the Federal-Aid Highway Act.

In the pending case, once it appeared that the passenger fees were supporting the entirety of the BPA's operating budget and that this budget was supporting some BPA activities of no benefit to the ferry passengers (at least, not in their capacity as ferry passengers), the District Court had no choice but to make particularized inquiries as to the various BPA expenditures. Activities properly deemed of no actual or potential benefit to the ferry passengers are (1) development projects on Steel Point Peninsula, (2) development projects on the BRMC and the leasing of a portion of the BRMC to Derecktor Shipyards, (3) establishing a high-speed ferry from Bridgeport to Stamford and New York City, (4) developing a barge-feeder service that would ship containers by barge from the Port of New York and New Jersey to Bridgeport, (5) operating a foreign trade zone in Bridgeport, (6) activities at the Cilco commercial shipping terminal located on land near the BRMC, and (7) some miscellaneous activities, including payment of attorneys to register a new trademark for the BPA and purchasing season tickets to local minor league teams.

Slightly closer questions are presented by the District Court's disallowance of the portion of the fees that supported dredging the Bridgeport harbor and operating a complimentary pump-out service for pleasure boats. Since the harbor was already sufficiently deep to

accommodate the ferries, the Appellees contend that they derive no benefit from additional dredging. However, they do benefit from minimizing the risk that larger vessels will run aground for lack of additional dredging and block use of the harbor by the ferries. Similarly, the appellees contend that they derive no benefit from complimentary pump-out services for pleasure boats, but the resulting reduction of pollution in the harbor is a benefit to the ferry passengers.

Although using a portion of the passenger fees to pay for these two services, which provide some benefit to ferry boat passengers, does not render the passenger fees excessive, it does fail to satisfy the fair approximation test. There is nothing in the record to indicate how the portion of dredging costs borne by the ferry passengers compares to the costs, if any, borne by large vessels docking at Bridgeport. And because the pump-out service is available to and benefits only the pleasure boats and only minimally benefits the ferry passengers, imposing the total cost on them through the passenger fee with no charge on the pleasure boats is not a fair approximation of use.

In sum, the District Court properly concluded that the existing fee violated the Commerce Clause and required an adjustment.

III. Tonnage Clause

The Tonnage Clause provides that "[n]o State shall . . . lay any Duty of Tonnage." U.S. Const. art. 1, § 10, cl. 3. As interpreted by the case law, the Tonnage Clause "prohibits . . . duties to raise general revenues." New Orleans Steamship Association v. Plaquemines Port, Harbor & Terminal District, 874 F.2d 1018, 1023 (5th Cir. 1989). Moreover, it requires that benefits and fees be "apportioned as closely as is practicable," Plaquemines Port, Harbor & Terminal District v. Federal Maritime Commission, 838 F.2d 536, 545 n.8 (D.C. Cir. 1988), and that the service be available to all fee payers, Clyde Mallory Lines, 296 U.S. at 266.

The District Court correctly applied the law to the facts in holding that "[t]he Passenger Fee imposed by the Port Authority is used for the impermissible purpose of raising general revenues and for projects which do not and could not benefit the ferry passengers." The testimony of the BPA's own expert and officials supports the Court's conclusion. John Arnold, the BPA's expert, testified that the BPA "act[s] as an incubator for growth of economic activity that supports the city itself"; the BPA's accountant testified that non-ferry projects benefit the City and "the entire community"; a commissioner of the BPA testified that the purpose of passenger fee has always been "to create a source of revenue to support the operations of the Port Authority." Finally, the BPA's executive

-21-

director Riccio testified, "I think anything that helps business and commerce in the State of Connecticut is going to indirectly benefit the ferry passengers." When asked whether it is fair to fund his travel expenses related to the BPA's non--ferry activities, Riccio testified "We don't work for the Port Jefferson Ferry Company or the Port Jefferson ferry passengers. We're a Port Authority and this is what we do. We're developing the port as our mission, bringing other maritime interest and businesses to the Port of Bridgeport." Based on these facts, the district court did not err in its legal conclusion.

In addition, the passenger fee offends the Tonnage Clause because the BPA's non-ferry services are not available to ferry passengers; they were "completely unrelated and unavailable to the fee payers." Charging the fee-payers for services that are not available to them is impermissible under the Tonnage Clause, even if not all fee payers actually use them. See Plaquemines, 838 F.2d at 545.

## Conclusion

The judgment of the District Court is affirmed.