JORDAN, Circuit Judge,
concurring in part and dissenting in part:
Although I concur in my colleagues’ resolution of Maher’s statutory and tort claims, I respectfully dissent from their conclusion that Maher has not stated a constitutional claim. The Majority Opinion runs contrary to a long line of Supreme Court precedent interpreting the Tonnage Clause. Most recently, in Polar Tankers, Inc. v. City of Valdez, Alaska, 557 U.S. 1, 129 S.Ct. 2277, 174 L.Ed.2d 1 (2009), the Court reaffirmed its broad reading of that clause as prohibiting state and local governments from doing indirectly what they may not do directly, namely, lay a tax on shipping. Id. at 8, 129 S.Ct. 2277. The Tonnage Clause forbids any attempt — “regardless of [its] name or form”, id — to raise revenue by charging duties on maritime commerce. That, however, is precisely what Maher alleges is the effect of the “Container Throughput Rental” assessments it must pay under the terms of its lease with the Port Authority. The assessments are a tax on the stevedores working with the vessels and will be passed on to the vessels, according to Maher. While those allegations may ultimately prove unfounded, I believe that Maher has pled sufficient facts to survive a motion to dismiss. I would therefore vacate the District Court’s dismissal of the Tonnage Clause claim as to the Container Throughput Rental assessments.
The Constitution declares that “No State shall, without the Consent of Congress, lay any Duty of Tonnage.... ” U.S. *113 Const., art. I, § 10, cl. 3. My colleagues correctly note that the word “tonnage” literally refers to the “entire internal cubical capacity, or contents of the ship or vessel expressed in tons of one hundred cubical feet....” In re State Tonnage Tax Cases, 12 Wall. 204, 79 U.S. 204, 212, 20 L.Ed. 370 (1870). The term “ ‘was used by the framers because at that day and time it was the customary mode of measuring the value of a ship.’ ” Erik M. Jensen, Quirky Constitutional Provisions Matter: The Tonnage Clause, Polar Tankers, and State Taxation of Commerce, 18 Geo. Mason L.Rev. 669, 683 (2011) (quoting Samuel Freeman Miller, Lectures on the Constitution of the United States 253 (photo reprint 1980) (New York & Albany, Banks & Bros. 1891)). But the Tonnage Clause has long since been extended to address taxation beyond the narrow reach inherent in that definition. It had to be, because, “taken in this restricted sense, the constitutional provision would not fully accomplish its intent.” So. Steamship Co. of New Orleans v. Portwardens, 73 U.S. 31, 34, 6 Wall. 31, 18 L.Ed. 749 (1867). It was designed to support the Constitution’s Import-Export Clause, which, as its name suggests, bars states from placing duties on imports or exports.[1] In re State Tonnage Tax Cases, 79 U.S. at 215 (“Tonnage duties are as much taxes as duties on imports or exports, and the prohibition of the Constitution extends as fully to such duties if levied by the States as to duties on imports or exports, and for reasons quite as strong as those which induced the framers of the Constitution to withdraw imports and exports from State taxation.”). By its very nature, the Tonnage Clause also serves the fundamental purpose of the Commerce Clause,[2] ensuring federal control over matters of interstate and foreign commerce. See Dept. of Revenue of State of Wash. v. Ass’n of Wash. Stevedoring Cos., 435 U.S. 734, 754, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978). In fact, James Madison “was of the opinion that the commerce clause independently restrained the states from imposing duties of tonnage.” Plaquemines Port, Harbor & Terminal Dist. v. Fed. Mar. Comm’n, 838 F.2d 536, 546 (D.C.Cir.1988). Nonetheless, the Tonnage Clause was added to the Constitution and so provided, along with the Import-Export Clause, a set of bars to complement the Commerce Clause barricade against state meddling in matters of national and foreign commerce.[3] These three clauses in combination — the Commerce Clause, the Import-Export Clause, and the Tonnage Clause — are meant to enhance the federal government’s power to speak with one voice on matters of trade, to protect federal import revenues from *114 state diversion, and to avoid discord among the states. See Michelin Tire Corp. v. Wages, 423 U.S. 276, 285-86, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976).
The purposes meant to be accomplished by constitutional provisions, however, may not come easily or naturally. Self-interest is a powerful countervailing force. In the context of maritime commerce, that has manifested itself in repeated efforts by state and local authorities to circumvent the Tonnage Clause, often by merely calling a tax something else or moving the aim of it from a ship to a related target. The Supreme Court has been vigilant in recognizing and rejecting such creativity. “A State cannot take what would otherwise amount to a tax on the ship’s capacity and evade the Clause by calling that tax ‘a charge on the owner or supercargo,’[4] thereby ‘justifying] this evasion of a great principle by producing a dictionary or a dictum to prove that a ship-captain is not a vessel, nor a supercargo an import.’ ” Polar Tankers, 557 U.S. at 8, 129 S.Ct. 2277 (alteration in original) (quoting Passenger Cases, 48 U.S. (7 How.) 283, 459, 12 L.Ed. 702 (1849) (Grier, J., concurring)). Put differently, an indirect tax on shipping is just as offensive as a direct one. “The States cannot lay export duties, nor duties on imports, nor tonnage duties on vessels. If they tax the master and crew, they indirectly lay a duty on the vessel. If the passengers on board are taxed, the protected goods — the imports — are reached.” Passenger Cases, 48 U.S. at 452 (Catron, J., concurring) (emphasis added). The allegations in this case present only the latest example of a self-interested local authority trying to tax commerce.
In levying its assessment upon the land-side marine terminal operator rather than the vessel or its representatives, the Port Authority is playing the exact labeling game that the Framers of our Constitution intended to foreclose by adopting the Tonnage Clause. The Port Authority is indirectly taxing vessels, and thus the goods on those vessels, by moving the locus of its assessments somewhere else, in this instance, to the water’s edge. We ought not permit this. My colleagues accept the argument that “the Tonnage Clause was meant to protect vessels” (Majority at 15), which is true, as far as it goes. But the Clause was never meant simply to protect vessels as such. The Framers were not worried about boats. They were worried about provincialism and protecting national control of commercial activity so that there would be a free flow of goods between the states and with other nations.[5] *115 They understood basic economics, including the way that indirect taxes on shipping would, if allowed, enrich coastal states at the expense of inland states. In the Federalist Papers, Alexander Hamilton noted that “[i]mposts, excises, and, in general, all duties upon articles of consumption, may be compared to a fluid, which will, in time, find its level with the means of paying them.” The Federalist No. 21. The very fact that the Framers felt the Tonnage Clause was necessary as a backstop to the Import-Export Clause demonstrates their recognition of the illusory distinction between direct and indirect taxes on goods.
In the end, they knew, any charge on shipping — whether on the goods themselves, the vessels conveying the goods, or on some other surrogate for the vessels and goods — would be passed on to consumers. The citizens of one state would benefit to the detriment of the citizens of another, and commerce would be impeded. According to Hamilton, “[t]he maxim that the consumer is the payer, is so much oftener true than the reverse of the proposition, -that it is far more equitable that the duties on imports should go into a common stock, than that they should redound to the ex-elusive benefit of the importing States.” The Federalist No. 35. Were such a tax on shipping permitted, whatever its guise, it would be “productive of inequality among the States; which inequality would be increased with the increased extent of the duties.” Id. As a consequence, “the assumption of most founders was that ... an indirect tax is one which the ultimate consumer can generally decide whether to pay by deciding whether to acquire the taxed product” — in other words, the assumption was that indirect taxes will get passed on to consumers in the form of higher prices. Erik M. Jensen, The Apportionment of “Direct Taxes”: Are Consumption Taxes Constitutional, 97 Colum. L.Rev. 2334, 2395 (1997).
For that reason, when an assessment is a revenue-raising tax on the privilege of “entering, trading in, or lying in port,” Clyde Mallory Lines v. Alabama ex rel. State Docks Comm’n, 296 U.S. 261, 265-66, 56 S.Ct. 194, 80 L.Ed. 215 (1935), and not a reasonable reimbursement for services rendered, it constitutes an impermissible duty of tonnage because it undermines federal control over commerce, regardless of the target of the assessment.[6] Hence, *116 “[t]he prohibition of a duty of tonnage should ... be construed so as to carry out [its] intent. A mere adherence to the letter, without reference to the spirit and purpose, may in this case mislead as it has misled in other cases.” Keokuk N. Line Packet Co. v. City of Keokuk, 95 U.S. (5 Otto) 80, 87, 24 L.Ed. 377 (1877).
Unfortunately, the Majority has been misled. The test it offers for distinguishing this case from those in which a Tonnage Clause violation was found is that the non-vessel targets of taxation in those cases — the captain, crew, passengers, etc. — were unlike the stevedores here because those targets were “representatives of ships” who “travel with the ships moving as vehicles in commerce.” (Majority at 108.) According to the Majority, taxes on such people might “indirectly impact a vessel’s decisions” as to how and where to travel. (Id.) But how can it be thought that the Container Throughput Rental assessments at issue here will not — in theory anyway — do the very same thing? Maher alleges that, at public cargo facilities, the Port Authority collects all fees and assessments from the vessels. By contrast, at leased cargo facilities like Maher’s, the “Port Authority collects fees and charges ... from the terminal operators, which in turn collect fees and charges from vessels and cargo using the terminals.” (App. at 3.) In other words, vessels are charged directly at public facilities, and indirectly at leased facilities. According to the Majority, that amounts to a constitutional difference, with the Tonnage Clause acting as a restraint at the former set of facilities but not at the latter.[7] It is hard to accept that conclusion, since national and international commerce is happening at both types of facilities, and thus the concerns motivating the Framers are fully in play at both.
Of course, the Majority’s distinction places Maher at a disadvantage in comparison with public cargo facilities — -why would a ship avail itself of a Maher terminal subject to indirect taxes,, when it can have access to public terminals where fees can only be charged for services rendered? And the size of Maher’s disadvantage is now at the whim of the Port Authority, itself the owner of the competing public cargo facilities. By my colleagues’ reasoning, though, that is of no moment. All the Port Authority needs to do to avoid the Tonnage Clause is insert a middleman between itself and the vessels to be taxed. If the Port Authority charges Maher fees for the privilege of stevedoring in its port, and Maher passes those fees on to the vessels, the vessels themselves have no Tonnage Clause claim against the Port Authority because their payments, nominally paid to Maher, would not be considered taxes. And the vessels could not sue Maher for a Tonnage Clause violation, as it is' not a sovereign entity. Only Maher can vindicate the Tonnage Clause interests at stake here. But, to the Majority, the Ton *117 nage Clause becomes a dead letter once a landside middleman is inserted. If the Port Authority wants to raise some extra revenue, it can do exactly that — with this Court’s blessing. That result effectively ignores the Supreme Court’s injunction that “the prohibition against tonnage duties ... embracefs] all taxes and duties regardless of their name or form ... which operate to impose a charge for the privilege of entering, trading in, or lying in a port.” Polar Tankers, 557 U.S. at 8, 129 S.Ct. 2277 (emphasis added) (internal quotation marks omitted).
The scope of constitutional protection should not be controlled by the fact that stevedoring services take place on land as well as on vessels. The. Supreme Court has specifically commented on the necessity to maritime commerce of the work done by stevedores:
Transportation of a cargo by water is impossible or futile unless the thing to be transported is put aboard the ship and taken off at destination. A stevedore who in person or by servants does work so indispensable is as much an agency of commerce as shipowner or master. Formerly the work was done by the ship’s crew; but, owing to the exigencies of increasing commerce and the demand for 'rapidity and special skill, it has become a specialized service -devolving upon a class as clearly identified with maritime affairs as are the mariners.
Puget Sound Stevedoring Co. v. Tax Comm’n of Wash., 302 U.S. 90, 92, 58 S.Ct. 72, 82 L.Ed. 68 (1937) (emphasis added) (internal quotation marks omitted), overruled by Dept. of Revenue of Wash. v. Ass’n of Wash. Stevedoring Cos., 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978).[8] The Supreme Court has thus already disavowed the distinction that today’s Majority draws. “What is decisive is the nature of the act, not the person of the actor.” Id. at 94, 58 S.Ct. 72. Cf. Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 288, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977) (“[A] focus on that formalism merely obscures the question whether the tax produces a forbidden effect.”).
The Passenger Cases best bear out the point. One of the cases at issue there involved a two-dollar-per-passenger assessment, levied on the “master, owner, *118 consignee, or agent” of any vessel landing in the port of Boston, which had to be paid before any passengers could disembark. Passenger Cases, 48 U.S. (7 How.) at 456. The Supreme Court declared, by a five-to-four vote, that the tax was unconstitutional. Id. at 573. But with eight justices writing separately, the rationale of the Court was left unclear. Four justices relied on the Tonnage Clause, including Justice Grier, who concluded that it did not matter whether, the tax was viewed as “a tax upon passengers or persons,” or as a tax upon vessels. Passenger Cases, 48 U.S. (7 How.) at 460 (Grier, J., concurring). He persuasively discussed why such a distinction inevitably breaks down:
It has been argued that this is not a tax on the master or the vessel, because in effect it is paid by the passenger having enhanced the price of his passage. Let us test the value of this argument by its application to other cases that naturally suggest themselves. If this act had, in direct terms, compelled the master to pay a tax or duty levied or graduated on the ratio of the tonnage of his vessel, whose freight was earned by the transportation of passengers, it might have been said, with equal truth, that the duty was paid by the passenger, and not by the vessel. And so, if it had laid an impost on the goods of the passenger imported by the vessel, it might have been said, with equal reason, it was only a tax on the passenger at last, as it comes out of his pocket, and, graduating it by the amount of his goods, affects only the modus or ratio by which its amount is calculated. In this way, the most stringent enactments may be easily evaded. It is a just and well-settled doctrine established by this court, that a State cannot do that indirectly which she is forbidden by the Constitution to do directly.... The Constitution of the United States, and the powers confided by it to the general government, to be exercised for the benefit of all the States, ought not to be nullified or evaded by astute verbal criticism, without regard to the grand aim and object of the instrument, and the principles on which it is based.
Passenger Cases, 48 U.S. (7 How.) at 458-59 (Grier, J., concurring) (emphasis added).[9] Thus the necessary breadth of the Tonnage Clause.
Justice Grier’s expansive reading of the Tonnage Clause has since acquired disposi-tive weight with the endorsement of his position by the Court in Polar Tankers. See Polar Tankers, 557 U.S. at 8, 129 S.Ct. 2277. Despite that, my colleagues apply an unduly restrictive reading to the Polar Tankers decision. According to them: “What actually made the tax in Polar Tankers unconstitutional, and what Maher cannot show here, is that the tax was directed at vessels and was not in ex *119 change for services.” (Majority at 109.) But that is not what the Supreme Court said. Far from limiting its reasoning to duties laid on vessels, the Supreme Court reiterated that the “prohibition against tonnage duties has been deemed to embrace all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port.” Polar Tankers, 557 U.S. at 8, 129 S.Ct. 2277 (internal quotation omitted). It would be hard to find more sweeping language than the words “regardless of their name or form” to describe the prohibited taxes, and likewise the words “entering, trading in, or lying in a port” seem intended to capture all trade-related activities in port.[10] Id. The Majority’s restrictive reading of Polar Tankers is at odds with the reasoning and language of the decision itself.
Although the present case involves a cargo throughput assessment levied on a stevedoring operation, conceptually, there is no difference between that and the fee levied in the Passenger Cases.[11] The Port Authority is “ ‘do[ing] that indirectly which [it] is forbidden ... to do directly,’ ” evading the Tonnage Clause “ ‘by producing a dictionary, or a dictum to prove that a [marine terminal operator] is not a vessel, nor a [stevedore] an import.’ ” Polar Tankers, 557 U.S. at 8, 129 S.Ct. 2277 (quoting Passenger Cases, 48 U.S. (7 How.) at 458, 459 (Grier, J., concurring)).[12]
*120 In sum, the Majority errs in giving the Tonnage Clause a singularly narrow reading, and I would reverse the portion of the District Court’s order that is based on that same errant view of the Constitution.

. The Import-Export Clause provides, "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress." U.S. Const, art. I, § 10, cl. 2.

. The Commerce Clause authorizes Congress to “regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.” U.S. Const, art. I, § 8, cl. 3.

.By including the Tonnage Clause, certain delegates to the Convention worried that it "would imply the opposite [ — that states could otherwise impose a tonnage duty — ] and put the states in a worse position,” Plaquemines, 838 F.2d at 546, but the Supreme Court has long rejected the notion that the absence of an express prohibition on states means that “any other commercial regulation, not expressly forbidden, to which the original power of the State was competent, may still be made,” Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 200, 6 L.Ed. 23 (1824) (Marshall, C.J.).

. A "supercargo” is "[a] person specially employed and authorized by a cargo owner to sell cargo that has been shipped and to purchase returning cargo, at the best possible prices; the commercial or foreign agent of a merchant.” Black's Law Dictionary 1575 (9th ed.2009).

. The Majority's reasoning gains no traction by invoking the "zone of interests” test. In Commerce Clause cases, as the Majority recognizes, "we have advocated a liberal employment of the zone of interests test, explaining that it is not meant to be especially demanding.” Oxford Assocs. v. Waste Sys. Auth. of E. Montgomery Cnty., 271 F.3d 140, 146 (3d Cir.2001) (internal quotation marks omitted). The bar of the "zone of interests” test is so low that it is satisfied by plaintiffs who merely “seek to vindicate interests related to the protection of interstate commerce.” Freeman v. Corzine, 629 F.3d 146, 157 (3d Cir.2010) (emphasis added). It would be odd, then, for the Tonnage Clause to have such a distinctly difficult "zone of interest” test, since the two clauses address the same concern.
In any event, the notion that Maher is not within the "zone of interests” of the Tonnage Clause is untenable. Maher's marine container terminal is the largest in the Port of New York and New Jersey, Maher unloads about one million ocean-shipping containers every year, and it paid $12.5 million in Container Throughput Rental assessments in 2010 alone. It is one of the world’s largest multi- *115 user marine container terminal operators, and has been operating at Port Elizabeth for over 60 years. The Tonnage Clause seeks to protect against local assessments that impose a charge on maritime trade. Polar Tankers, 557 U.S. at 8, 129 S.Ct. 2277. Maher's position as a major stevedoring business is thus more than enough to satisfy the “zone of interests" test.

. It bears mention that the Tonnage Clause is one of the'few limitations of the Constitution that is not absolute but instead only disallows states from enacting such duties "without the Consent of Congress.” U.S. Const., art. I, § 10, cl. 3. The Port Authority is thus free to seek an Act of Congress permitting the fees at issue here. Indeed, the Water Resources Development Act itself is specifically styled as congressional consent to impose an others wise-impermissible duty of tonnage. See 33 U.S.C. § 2236(a). Rather than foreclose all such taxes, the Tonnage Clause operates to move decision-making over duties of tonnage to Congress, thereby ensuring its control over matters of national commerce. The potential permissibility of such taxes, with congressional assent, makes plain "the necessity of a rigid adherence to the demands of” the Tonnage Clause. Cannon v. City of New Orleans, 87 U.S. (20 Wall.) 577, 583, 22 L.Ed. 417 (1874).
If hardships arise in the enforcement of this principié, and the just necessities of a local commerce require a tax which is otherwise forbidden, it is presumed that Congress would not withhold its assent if properly informed and its consent requested. This is a much wiser course, and Congress is a much safer depositary of the final exercise of this important power than the ill-regulated and overtaxed towns and cities, which *116 are not likely to look much beyond their own needs and their own interests.
Id. By upholding the assessment levied here, the Majority forecloses the need for cooperative federalism and instead permits the Port Authority to make the decision alone, without proper input from Congress.

. In the case of the Cargo Facility Charge, the Port Authority actually requires that the “user of cargo handling services” (i.e., the vessels) pay charges "to the Port Authority”, but the charge "will be collected by the terminal operator”, like Maher, "for remittance to the Port Authority.” (App. at 345.) In other words, Maher is nothing more than the collector of such charges directly on behalf of the Port Authority, and keeps none of the assessment for itself. Presumably, the Majority would have no problem with such a levy, even if it otherwise violated the Tonnage Clause, because the money first passed through die hands of the terminal operator.

. In Puget Sound, the Supreme Court struck down the State of Washington’s effort to impose a business tax on a stevedoring company as a violation of the Commerce Clause. 302 U.S. 90, 58 S.Ct. 72, 82 L.Ed. 68 (1937). The Court reasoned that, because ''[t]he business of loading and unloading” ships constitutes interstate commerce, Washington was per se not permitted to impose its tax. Id. at 94, 58 S.Ct. 72. When Washington again tried to tax stevedores in 1974, the Supreme Court reconsidered and overruled its holding in Puget Sound. See Dept. of Revenue of Wash. v. Ass'n of Wash. Stevedoring Cos., 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978). In changing the applicable law, the Supreme Court did nothing to alter its admonition in Puget Sound concerning the importance of stevedores in maritime commerce. In the later case, the Supreme Court reasoned that a tax on interstate commercial activity does not offend the Commerce Clause when the tax “applied to activity with a substantial nexus with the State, that are fairly apportioned, that do not discriminate against interstate commerce, and that are fairly related to the services provided by the State.” Id. at 750, 98 S.Ct. 1388. In light of this new, fact-intensive approach to challenges to state taxation under the Commerce Clause, the Court ultimately upheld the Washington tax at issue because “respondents relied below on the per se approach of Puget Sound and ... [therefore] they developed no factual basis on which to declare the Washington tax unconstitutional as applied to their members and their stevedoring activities.” Id. at 751, 98 S.Ct, 1388. In neither Puget Sound nor Dept, of Revenue of Washington did the Court consider the scope or applicability of the Tonnage Clause.

. More recently, the Second Circuit adhered to this principle in Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth., in holding that a passenger fee violated the Tonnage Clause. 567 F.3d 79, 88 (2d Cir.2009). The amount of the passenger fee varied depending upon whether the passenger was a person, a car, a truck, or a bus. Id. at 83. Although the passenger fee was collected from passengers by the ferry company and thereafter remitted to the state, the state reimbursed the ferry company with an administrative fee for its trouble. Id. The Bridgeport Court correctly referred to the passengers as the fee payers, id. at 88, as the fee was ultimately passed on to passengers in the form an increase in ticket prices. Even though the fee represented a small percentage of overall ticket prices — in 2005 a one-way ferry ticket for a vehicle with unlimited passengers was $51.25, while the corresponding passenger fee was $2.75, id. at 83 — the Second Circuit recognized that such a fee charged to passengers, with no corresponding benefit to them, was impermissible under the Tonnage Clause.

. My colleagues warn that, if we unmoor the Tonnage Clause from taxes on vessels, then landside entities having some relationship to maritime commerce would be able to challenge any unreasonable state-imposed fees for the privilege of doing business at a port. For example, they say, a restaurant renting state property in a port could state a claim under the Tonnage Clause by claiming that its rent is unreasonably high given the services provided by the state. That hypothetical misses the mark by a wide margin. To begin with, a rental fee is clearly reimbursement for a service rendered: providing the property on which the lessee- can conduct its business. Further, unlike the restaurateur from the Majority’s hypothetical, Maher does not have merely some tenuous relationship to maritime commerce. Maher is directly engaged in it. As the Supreme Court recognized in Puget Sound, such commerce could not occur without stevedores like Maher to load and unload seaborne cargo. The faithful construction of the Tonnage Clause that I propose will not, as the Majority fears, encompass disputes unrelated to volumetric charges. It will, instead, avoid arbitrary line-drawing that forecloses claims by entities that are clearly within the Tonnage Clause’s zone of interest.

. The Majority implicitly recognizes as much. It announces that the Tonnage Clause applies to taxes on passengers because such duties "will likely indirectly impact a vessel’s decisions by reducing demand,” but then, inconsistently, says that the Clause does not apply to a fee on Maher because such a fee "does not in and of itself impact a vessel's ability to freely navigate in commerce.” (Majority at 108.)

.While I dissent from my colleagues’ narrow reading of the Tonnage Clause, I have no disagreement with their conclusion that the Basic Rental assessment does not violate that constitutional provision. The Basic Rental assessment, unlike the Container Throughput Rental, is more properly considered, a fee for services rendered than a revenue-raising tax. The Port Authority owns the marine terminal and is entitled to "just compensation for the use of such property.” Cannon, 87 U.S. (20 Wall.) at 582. Although the Basic Rental constitutes a fee for services, on the facts alleged by Maher, the Container Throughput Rental does not. According to Maher’s complaint, the fees charged in the Container Throughput Rental "substantially exceed the costs of services provided by the Port Authority to the cargo or vessels” and "escalate at two to three year intervals without corresponding increases in the level of services provided by the Port Authority to the cargo or vessels.” (App. at 42.) The fees are used to “subsidize other terminals” and "for other purposes not benefiting the vessels and cargo that use Maher's container terminal, including but not limited to, expenses to purchase and develop marine terminals for vessels that *120 do not or cannot use Maher's container terminal.” (App. at 44.) Also, the Container Throughput Rentals vary by the volume of cargo that is loaded and unloaded at Maher’s terminal — thus striking at the very heart of the concerns motivating the Tonnage Clause — while any services provided do not. Maher pays a higher Container Throughput Rental the more cargo it unloads, and, according to its Complaint, receives nothing from the Port Authority in return.
To the extent the District Court held that "most (if not all) of the rental charges and fees imposed by Port Authority against Maher would likely be the type of charges for services rendered that fall outside the Tonnage Clause's scope” (App. at 12-13 (internal quotations omitted)), it did not view the facts in the light most favorable to and draw all reasonable inferences in favor of Maher. In its Complaint, Maher repeatedly emphasized the disconnect between the amount paid and the services rendered, but the District Court did not adequately credit Maher’s assertions.