PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3626
_____

MAHER TERMINALS, LLC,
                                        Appellant

v.

THE PORT AUTHORITY OF NEW YORK AND NEW
JERSEY; PATRICK FOYE, in his official capacity as
Executive Director of the Port Authority of New York and
New Jersey
_____

On Appeal from United States District Court
for the District of New Jersey
(D.N.J. No. 2-12-cv-06090)
District Judge:  Honorable Kevin McNulty
_____

Argued June 3, 2015
Before:  FISHER, JORDAN, and SHWARTZ, *Circuit
Judges*.

(Filed: October 1, 2015)

James S. Richter, Esq.
Winston & Strawn
One Gateway Center
7th Floor
Newark, NJ 07102

Lawrence I. Kiern, Esq. ***ARGUED***
Gerald A. Morrissey, III, Esq.
Winston & Strawn
1700 K Street, N.W.
Washington, DC 20006
  *Counsel for Appellant*

Adam B. Banks, Esq.
Jared R. Friedmann, Esq.
Richard A. Rothman, Esq.
Weil, Gotshal & Manges
767 Fifth Avenue
27th Floor
New York, NY 10153

Peter D. Isakoff, Esq. ***ARGUED***
Weil, Gotshal & Manges
1300 Eye Street, N.W.
Suite 900
Washington, DC 20005
  *Counsel for Appellees*

———

OPINION OF THE COURT

———

2

FISHER, *Circuit Judge*.

Although Maher Terminals, LLC ("Maher") challenges the rent it must pay under its lease agreement ("the Lease") with the Port Authority of New York and New Jersey ("the Port Authority"), this case is not a typical landlord-tenant dispute. Maher, a landside marine terminal operator, asserts that the rent due under the Lease violates the U.S. Constitution's Tonnage Clause, U.S. Const. art. I, § 10, cl. 3, as well as two related federal statutes, all of which historically have concerned taxes and fees imposed on vessels, their owners, and their passengers and crews. The District Court dismissed Maher's complaint in its entirety, reasoning that Maher's rent obligations did not violate the Tonnage Clause or its related statutes, and that Maher failed to establish admiralty jurisdiction for its remaining tort claim. We agree and hold that landside service providers like Maher are not within the class of plaintiffs that the Tonnage Clause or its related federal statutes were intended to protect, that is, they are outside each law's zone of interests. Accordingly, we will affirm.

I.

Maher is a marine terminal operator with its principal place of business in Elizabeth, New Jersey. Maher's primary business is to load and unload cargo on vessels—also known as stevedoring—and to berth vessels at its terminal. The Port Authority is an entity created by a compact between New York and New Jersey with the consent of Congress. The Port Authority oversees various transportation systems and, of most relevance to this appeal, the Port of New York and New

3

Jersey, the third largest seaport in North America and the largest maritime cargo center on the eastern seaboard.[1]

The Port Authority leases many of its marine terminal facilities at the Port of New York and New Jersey to private companies like Maher, which in turn directly manage the terminals and provide stevedoring services to ships using those terminals. In October 2000, Maher signed a thirty-year lease with the Port Authority to rent the largest marine terminal at Port Elizabeth, consisting of 445 acres of improved land including structures and a berthing area.

The Lease divides Maher's rent into two categories. First, the "Basic Rental" charges Maher a fixed rate per acre of the terminal. When the complaint was filed in 2012, the Basic Rental was $50,413 per acre, totaling $22,433,612 for the year. The second form of rent—and this is the crux of the case—is the "Container Throughput Rental" ("Throughput Rental"), which is a variable charge based on the type and volume of cargo that is loaded and unloaded at Maher's terminal. For the first eight years of the Lease's term, Maher was exempted from paying any Throughput Rental. Since 2008, the Throughput Rental has been calculated based on the following formula: the first 356,000 containers loaded and unloaded by Maher are exempted from any fees; for containers 356,001 to 980,000, Maher pays a per-container fee set forth by a schedule in the Lease ($19.00 per container when the complaint was filed); and for each container over 980,000, Maher pays a lower fee ($14.25 per container when the complaint was filed).

In addition, Maher must load and unload a minimum amount of cargo annually as a condition of maintaining the

---

[1] Individual appellee Patrick Foye is the Port Authority's Executive Director.

Lease (420,000 containers when the complaint was filed, which is subject to increase to 900,000 containers upon completion of certain harbor improvements), and Maher must pay an annual guaranteed minimum Throughput Rental equivalent to loading and unloading 775,000 containers (subject to the exemption for the first 356,000 containers), regardless of the number of containers Maher actually handles. All told, Maher paid roughly $12.5 million in Throughput Rental in 2010, and it expected the 2012 Throughput Rental to increase to $14 million.

According to Maher, the Port Authority profits from the Lease. The Port Authority also allegedly uses revenue from the Lease to fund harbor-improvement projects as well as projects wholly unrelated to the services that the Port Authority provides to Maher or vessels using the port.

In September 2012—nearly twelve years after the Lease's effective date—Maher sued the Port Authority in the U.S. District Court for the District of New Jersey. Maher's complaint alleged violations of the U.S. Constitution's Tonnage Clause, U.S. Const. art. I, § 10, cl. 3; the Rivers and Harbors Appropriation Act ("RHA"), 33 U.S.C. § 5(b); and the Water Resources Development Act ("WRDA"), 33 U.S.C. § 2236. Maher also asserted a negligence claim against the Port Authority for the way it established and collected fees.

The Port Authority moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and in July 2014, the District Court granted the motion. The District Court reasoned that Maher lacked standing to bring its Tonnage Clause and RHA claims because it was not a protected vessel. Even if Maher had standing, the Tonnage Clause and RHA claims still failed, the District Court held, because Maher did not adequately plead that any fees imposed on vessels were not for services

5

rendered. The District Court also dismissed Maher's WRDA claim because Maher had not shown that the Port Authority imposed fees on vessels or cargo and because the WRDA did not prohibit the Port Authority from using revenue from the Lease to finance harbor-improvement projects. Finally, the District Court decided that it lacked admiralty jurisdiction over Maher's negligence claim and declined to exercise supplemental jurisdiction over the claim. Maher filed this timely appeal.[2]

## II.

The District Court exercised jurisdiction only under 28 U.S.C. § 1331, concluding that it lacked admiralty jurisdiction over Maher's negligence claim under 28 U.S.C. § 1333(1) and declining to exercise supplemental jurisdiction over that claim under 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291.

Regardless of whether the District Court dismissed Maher's complaint for failure to state a claim or for lack of jurisdiction, our standard of review is the same: we exercise plenary review over the District Court's order. *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 174 (3d Cir. 2015) (failure to state a claim); *Constitution Party of Pa. v. Aichele*, 757

---

[2] While Maher has been litigating this case, it has also been disputing the Lease's terms before the Federal Maritime Commission. *See Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, No. 08-03, 2014 WL 7328474 (FMC Dec. 17, 2014). The FMC concluded that the Port Authority did not violate the Shipping Act, 46 U.S.C. § 40101, by giving an unreasonable preference to another terminal or imposing an unreasonable prejudice on Maher based on the terms of the Lease, including the minimum Throughput Rental. *Id.* at *1, *24.

F.3d 347, 356 n.12 (3d Cir. 2014) (lack of jurisdiction, including lack of standing). And because any jurisdictional challenge here is facial, in either circumstance, we apply the same standard the District Court did, accepting as true the facts alleged in the complaint and drawing reasonable inferences in Maher's favor. *Kaymark*, 783 F.3d at 174; *Aichele*, 757 F.3d at 356 n.12, 358 (distinguishing facial attacks on jurisdiction from factual ones). We also may consider documents that are "*integral to or explicitly relied* upon in the complaint," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotation marks omitted), such as the Lease here.

With respect to Maher's negligence claim, we review the District Court's determination of its own admiralty jurisdiction de novo, *Sinclair v. Soniform, Inc.*, 935 F.2d 599, 601 (3d Cir. 1991), but we review the Court's refusal to exercise supplemental jurisdiction over state law claims for abuse of discretion, *Figueroa v. Buccaneer Hotel Inc.*, 188 F.3d 172, 175 (3d Cir. 1999).

## III.

The central question on appeal is whether fees imposed on landside entities like Maher can support claims under the Tonnage Clause, the RHA, and the WRDA. A secondary question is whether the District Court correctly decided that it lacked admiralty jurisdiction, and declined to exercise supplemental jurisdiction over Maher's negligence claim. We address these issues in turn.

## A.

The U.S. Constitution prohibits states from "lay[ing] any Duty of Tonnage" without the consent of Congress. U.S. Const. art. I, § 10, cl. 3. Maher alleges that several fees imposed by the Lease, but principally the Throughput Rental,

7

violate the Tonnage Clause.[3] Maher contends that the District Court incorrectly concluded that Maher lacked standing to bring a Tonnage Clause claim and that Maher did not adequately plead a violation of the Tonnage Clause.

Standing involves "constitutional limitations on federal-court jurisdiction" on the one hand and "prudential limitations" on the other. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Here the District Court concluded that Maher's Tonnage Clause claim failed for lack of standing, but the Court did not explain whether its holding was based on constitutional or prudential limitations. We read the District Court's opinion as relying on prudential limitations, not

---

[3] On appeal, Maher also challenges the Cargo Facility Charge ("CFC"), which requires "a user of cargo handling services" to pay a fee "to the Port Authority, which will be collected by the terminal operator handling the user's cargo [i.e., Maher] for remittance to the Port Authority." J.A. 345. The Port Authority correctly points out that Maher's complaint only obliquely refers to the CFC, and that Maher did not raise the CFC before the District Court. At oral argument, counsel for Maher argued that the minimum volumetric guarantee, which we understand to be part of the Throughput Rental, also violates the Tonnage Clause. As explained below, however, the categories of fees challenged by Maher are ultimately unimportant because they do not change the fact that Maher is not a vessel or its representative and therefore cannot state a claim under the Tonnage Clause, the RHA, or the WRDA.

8

constitutional ones.[4] The District Court made no reference to the requirements of constitutional standing, instead explaining that Maher lacked standing because it was "not a vessel or other protected entity under the Tonnage Clause." *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, Civ. No. 2:12-6090 KM, 2014 WL 3590142, at \*8 (D.N.J. July 21, 2014). In other words, the District Court concluded that Maher fell outside the class of plaintiffs who are protected by the Tonnage Clause. In so doing, the District Court effectively conducted a zone-of-interests analysis. *See Lexmark Int'l, Inc.*

---

[4] In any event, we have no trouble concluding that Maher has constitutional standing to bring its claims. "Constitutional standing has three elements: injury in fact, causation, and redressability." *Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*, 783 F.3d 156, 161 (3d Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Here the Port Authority argues that Maher suffers no injury in fact from fees that Maher passes on to vessels. This argument is unpersuasive. Maher is responsible for the fees regardless of whether it passes them on to vessels. *See Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 267 (1984) (concluding that wholesalers had alleged an economic injury caused by a tax that they were liable to pay even if they could pass on the tax to customers). This conclusion applies to all of Maher's claims. To the extent the District Court's analysis was based on constitutional standing, *see Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, Civ. No. 2:12-6090 KM, 2014 WL 3590142, at \*8 & n.11 (D.N.J. July 21, 2014) (discussing Rule 12(b)(1) dismissal), the District Court was wrong. Still, we may affirm on any grounds supported by the record. *Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).

*v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014) (framing the zone-of-interests test as asking whether a particular plaintiff "falls within the class of plaintiffs" authorized to sue under a particular law).

We have previously categorized the zone-of-interests requirement as one of three components of prudential standing. *E.g.*, *Freeman v. Corzine*, 629 F.3d 146, 154 (3d Cir. 2010).[5] But in *Lexmark International, Inc. v. Static Control Components, Inc.*, the Supreme Court criticized the placement of the zone-of-interests requirement within the rubric of prudential standing. 134 S. Ct. at 1387 ("[P]rudential standing is a misnomer as applied to the zone-of-interests analysis." (internal quotation marks omitted)); *see also Shalom Pentecostal Church*, 783 F.3d at 163 n.7. The Court clarified that the zone-of-interests requirement goes to whether a particular plaintiff has a cause of action under a given law, not a plaintiff's standing. *Lexmark*, 134 S. Ct. at 1387. Though *Lexmark* was decided only a few months before the District Court's decision in this case, we agree with Maher that *Lexmark* strongly suggests that courts shouldn't link the zone-of-interests test to the doctrine of standing and that the District Court erred by apparently doing so here. But putting aside the label that applies to the zone-of-interests test, we agree with the District Court that Maher still must satisfy this test to state a Tonnage Clause claim and, as explained below, that Maher fails the test.

---

[5] The other two components of prudential standing are that a plaintiff first must "assert his or her own legal interests rather than those of third parties," and second must not assert "generalized grievances" that require courts to "adjudicat[e] abstract questions." *Freeman*, 629 F.3d at 154 (internal quotation marks and brackets omitted).

In applying the zone-of-interests test, we must discern the meaning and purpose of the Tonnage Clause using traditional methods of interpretation and ask whether it extends to Maher's claim. *Cf. id.* at 1388–89 (analyzing the meaning and purposes of the Lanham Act to determine the interests protected by the Act). We have applied the zone-of-interests test "liberal[ly]" and have noted "that it is not meant to be especially demanding." *Oxford Assocs. v. Waste Sys. Auth. of E. Montgomery Cnty.*, 271 F.3d 140, 146 (3d Cir. 2001) (internal quotation marks omitted). The test is particularly generous in the context of challenges to agency actions under the Administrative Procedure Act, but it may be less so in other contexts. *Lexmark*, 134 S. Ct. at 1389.

Turning to the Tonnage Clause's meaning, "we are guided by the principle that the Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (internal quotation marks and brackets omitted). Although the Constitution appears to speak broadly by prohibiting states from "lay[ing] any Duty of Tonnage," the term "Duty of Tonnage" had a well-known meaning to the founding generation. It referred to the common commercial practice of taxing "a ship . . . according to 'the internal cubic capacity of a vessel,' *i.e.*, its tons of carrying capacity." *Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 6 (2009) (quoting *Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n*, 296 U.S. 261, 265 (1935)). Further, tonnage duties referred to taxes "on the privilege of access by vessels to the ports of a state" and "were distinct from fees . . . for services facilitating commerce." *Clyde Mallory Lines*, 296 U.S. at 265.

To the Framers, the Tonnage Clause supported and shared a purpose with the Import-Export Clause, U.S. Const.

11

art. I, § 10, cl. 2, which generally prohibits states from taxing imports and exports. *See Clyde Mallory Lines*, 296 U.S. at 264–65. The purpose of the Import-Export Clause, in turn, was to prevent states with convenient ports from taxing goods travelling in commerce at the expense of consumers in less-fortunately located states. *See Polar Tankers*, 557 U.S. at 7. The Framers understood that the Import-Export Clause could be effectively "nullified" "[i]f the states had been left free to tax the privilege of access by vessels to their harbors." *Clyde Mallory Lines*, 296 U.S. at 265; *accord S.S. Co. v. Portwardens*, 73 U.S. (6 Wall.) 31, 34–35 (1867). Although there was some disagreement about whether the Commerce Clause already prohibited tonnage duties, *Clyde Mallory Lines*, 296 U.S. at 265 n.1, the Tonnage Clause was adopted to "prevent that nullification" and to further restrain states from obtaining "geographical vessel-related tax advantages," *Polar Tankers*, 557 U.S. at 7.

To effectuate these purposes, the Supreme Court has interpreted the Tonnage Clause to prohibit more than only classic tonnage duties, i.e., taxes on a ship based on the ship's capacity; the Court has also said that a state cannot "'do that indirectly which she is forbidden . . . to do directly.'" *Id.* at 8 (alteration in original) (quoting *Passenger Cases*, 48 U.S. (7 How.) 283, 458 (1849)). Thus, the Tonnage Clause prohibits taxes that vary according to ratios other than a ship's capacity, such as the number of masts, mariners, or passengers. *Id.* It likewise prohibits taxes that are imposed not just on the vessel itself but also on the ship captain, owner, supercargo (the person in charge of the cargo on the ship), and passengers. *Id.*; *Passenger Cases*, 48 U.S. (7 How.) at 458–59. The Clause even prohibits flat taxes on a ship—those that do not vary according to tonnage—if they are for the privilege of entering a port. *Portwardens*, 73 U.S. (6 Wall.) at

12

34–35. In sum, the Tonnage Clause's prohibition "embrace[s] all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port." *Clyde Mallory Lines*, 296 U.S. at 265–66.

Consistent with the original understanding of tonnage duties, the Tonnage Clause does not prohibit states from charging vessels "for services rendered to and enjoyed by the vessel, such as pilotage, or wharfage, or charges for the use of locks on a navigable river, or fees for medical inspection." *Id.* at 266 (citations omitted). Charges for such services, even those that vary according to tonnage, are constitutional for at least two reasons. First, they are not taxes—which are assertions of sovereignty—but are instead demands for reasonable compensation—which are assertions of a right of property. *Packet Co. v. Keokuk*, 95 U.S. 80, 85 (1877). Second, charges for services are constitutional because they facilitate, rather than impede, commerce. *See Clyde Mallory Lines*, 296 U.S. at 265–66; *Keokuk,* 95 U.S. at 84 ("[A charge for services rendered] is not a hindrance or impediment to free navigation.").

Of course, a state may not escape the Tonnage Clause's reach merely by labelling a tax as a charge for services. *Keokuk*, 95 U.S. at 86; *Cannon v. City of New Orleans*, 87 U.S. (20 Wall.) 577, 580 (1874) ("A tax which is . . . due from all vessels arriving and stopping in a port, without regard to the place where they may stop, . . . cannot be treated as a compensation for the use of a wharf."). Vessels that pay a purported services charge must actually receive a proportionate benefit in return. *See State Tonnage Tax Cases*, 79 U.S. (12 Wall.) 204, 220 (1870) (striking down a tax because it was "an act to raise revenue without any

13

corresponding or equivalent benefit or advantage to the vessels taxed"). So it is constitutional for a state to demand "just" and "reasonable compensation" for services rendered, *Cannon*, 87 U.S. (20 Wall.) at 582, but the inverse must also be true: a state may not demand unjust and unreasonable compensation for services, even if services are actually rendered. Additionally, a reasonable charge for general services that benefit all ships that enter a port, such as policing services for a harbor, is constitutional, *see Clyde Mallory Lines*, 296 U.S. at 266–67, but a tax that has a "general, revenue-raising purpose" is probably not, *see Polar Tankers*, 557 U.S. at 10.

From this discussion, we conclude that the Tonnage Clause was meant to protect vessels as vehicles of commerce. *See Keokuk*, 95 U.S. at 84–85 ("[The Tonnage Clause] was designed to guard against local hindrances to trade and carriage *by vessels . . . .*" (emphasis added)). Tonnage duties were originally understood as taxes on vessels, and the modern formulation from *Clyde Mallory Lines* and *Polar Tankers* extending the Clause to all "charge[s] for the privilege of entering, trading in, or lying in a port" does nothing to change the fundamental object of the provision. The body of law surrounding the services exception to the Tonnage Clause drives home the point. Fees for services are allowed because they do not impede a vessel's free navigation in commerce and are only levied when a "passing vessel" elects to use those services, *see Keokuk*, 95 U.S. at 85, a concern that is plainly inapplicable to non-vessel plaintiffs. Therefore, to come within the Tonnage Clause's zone of interests, we hold that a plaintiff must allege an injury to a vessel as a vehicle of commerce.

Our conclusion does not conflict with the Supreme Court's admonition that the Tonnage Clause prohibits indirect

tonnage duties and, consequently, extends to taxes imposed not only on a vessel, but also on an owner, ship captain, supercargo, or the passengers; to the contrary, the two are very much consistent. Though these people are obviously not ships, the Tonnage Clause prohibits taxes imposed on them because they are representatives of ships. *See Passenger Cases*, 48 U.S. (7 How.) at 458 ("It is . . . a duty on the vessel . . . . It is a taxation of the master, as representative of the vessel and her cargo."). And unlike the landside provider of harbor services, these people travel with the ships moving as vehicles in commerce. As discussed above, the Tonnage Clause protects the rights of vessels to navigate free of local hindrances by prohibiting charges that the vessels do not choose to incur. Just as a tax on a vessel impedes the vessel's ability to freely move in commerce, taxes on the people on board the vessel have the same effect. Taxes on certain people (the owner, captain, supercargo, and crew) directly impact where a vessel decides to make port by taxing those responsible for the vessel's navigation, and taxes on passengers will likely indirectly impact a vessel's decisions by reducing demand for passage on the vessel. The interests of these people are the same as the interests of the vessels they occupy, so the Tonnage Clause prohibits taxes on them just as it prohibits taxes on the vessels themselves.

As a landside marine terminal operator challenging the rent it owes under the Lease, Maher is not a member of the class of plaintiffs that can state a claim under the Tonnage Clause. Maher's injury is not an injury to a vessel or its representative. Unlike a fee imposed on a vessel or the people on board, a fee imposed on Maher does not in and of itself impact a vessel's ability to freely navigate in commerce. Fees imposed on Maher affect vessels *only if* Maher passes on such fees to vessels that use its terminal for stevedoring services.

15

That it is not enough for Maher to satisfy the zone-of-interests test. A party may not contract its way into a law's zone of interests if that party does not itself have any protected interests under the law. *Cf. Freeman*, 629 F.3d at 157 ("[P]laintiffs who allege only that a party with whom they contract is subject to an undue burden on its ability to freely participate in interstate commerce are not within the zone of interests protected by the dormant Commerce Clause." (internal quotation marks omitted)). To hold otherwise would allow parties to evade the first prudential standing requirement: that parties must assert their own legal interests, not the interests of third parties. *See id.* at 154. Therefore, the Tonnage Clause is not concerned with taxes on any entity that has some relationship with vessels; rather, it prohibits taxes that are directed at vessels or their representatives. Vessels

may be able to challenge Maher's rent,[6] but Maher cannot assert the rights of third-party vessels.[7]

---

[6] We do not hold that *vessels* or their representatives could never challenge tonnage duties that are passed through a private entity like Maher.

[7] Although third-party standing—standing to assert the legal interests of third parties—is allowed in "exceptional" circumstances, *Amato v. Wilentz*, 952 F.2d 742, 750 (3d Cir. 1991), Maher did not seek third-party standing here, mostly because it did not believe it needed to allege that the vessels paid the tonnage duties in this case. But even if Maher had made a third-party standing argument, it would have failed. In deciding whether Maher should have third-party standing, we consider, inter alia, (1) whether Maher had a close relationship with the third-party vessels and (2) whether the third-party vessels faced some obstacles to bringing their own lawsuits. *See Pa. Psychiatric Soc'y v. Green Spring Health Servs. Inc.*, 280 F.3d 278, 288–89 (3d Cir. 2002). Maher does not appear to have the requisite close relationship with the allegedly-injured vessels. Fifteen years ago, Maher agreed to the Throughput Rental that it now claims violates the vessels' rights under the Tonnage Clause. Additionally, there are limited obstacles to vessels asserting their own claims under the Tonnage Clause if they believe they are paying unconstitutional tonnage duties. Finally, and perhaps most fundamentally, it is unclear from Maher's complaint whether any vessels are actually paying unconstitutional tonnage duties. Maher's allegations about passing on the fees to the vessels are quite vague, and Maher does not adequately allege that the vessels are paying unreasonable fees for the services they receive from Maher (the services provider) as a result of the rent due under the Lease.

17

We are unpersuaded by Maher's argument that it satisfies the zone-of-interests test because it is "engaged in interstate commerce" and "seek[s] to vindicate interests related to the protection of interstate commerce." Maher Br. 32 (alteration in original) (internal quotation marks omitted). For support, Maher relies on cases applying the zone-of-interests test in the context of the dormant Commerce Clause. *See Freeman*, 629 F.3d at 156–57; *Oxford Assocs.*, 271 F.3d at 146. Though the Tonnage Clause supports the Commerce Clause (as well as the Import-Export Clause), the Tonnage Clause is not the Commerce Clause. The Tonnage Clause protects the free flow of commerce through a specific means—by protecting vessels operating as vehicles of commerce.

Nor is Maher within the Tonnage Clause's zone of interests because it pays fees that vary according to the volume of cargo moving through its port. In *Polar Tankers*, the Supreme Court said that the tax at issue there was "at the heart of what the Tonnage Clause forbids." 557 U.S. at 10. It did so in part because the tax "depend[ed] on a factor related to tonnage," i.e., a ship's cargo capacity, in that it applied to vessels only of a certain size. *Id.* But other cases teach us that whether a fee varies according to tonnage is not actually the touchstone of unconstitutional tonnage duties. *See Clyde Mallory Lines*, 296 U.S. at 265-66 (holding that the Tonnage Clause prohibits "all taxes and duties regardless of their name or form, *and even though not measured by the tonnage of the vessel*, which operate to impose a charge for the privilege of entering, trading in, or lying in a port" (emphasis added)); *Portwardens*, 73 U.S. (6 Wall.) at 35 (holding that the Tonnage Clause prohibits "*fixed*" fees as well as fees that vary with vessels' capacity (emphasis added)). We therefore do not read *Polar Tankers* or any of the Tonnage Clause

precedent as standing for the proposition that any fee on anyone or anything that varies according to cargo volume is an unconstitutional tonnage duty, as Maher does. What actually made the tax in *Polar Tankers* unconstitutional, and what Maher cannot show here, is that the tax was directed at *vessels* and was not in exchange for services. *See* 557 U.S. at 10 (noting that "the tax applie[d] only to large ships" and was "not for services provided to the vessel[s]"). The same is true of *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Authority*, where the Second Circuit struck down a fee imposed on all passengers of a ferry under the Tonnage Clause. 567 F.3d 79, 88 (2d Cir. 2009). Although the tax in *Bridgeport* varied depending on whether the passenger was a person or vehicle, the tax was unconstitutional, in our view, because it was directed at a *vessel's passengers*.

If we unmoor the Tonnage Clause from taxes on vessels and allow landside entities to bring Tonnage Clause claims, we would transform the Tonnage Clause into a broad "Maritime Commerce Clause." Landside entities having some relationship to maritime commerce would be able to challenge not only volumetric charges like the one here, but any unreasonable state-imposed fees for the privilege of being in a port. *See Portwardens*, 73 U.S. (6 Wall.) at 35 ("It was not only a *pro rata* tax which was prohibited, but any duty . . . ."). So, for example, a restaurant renting state property in a port that serves food to mariners fresh off a vessel could state a claim under the Tonnage Clause by claiming that its rent is unreasonably high given the services provided by the state. We doubt the Framers intended the Tonnage Clause to sweep so broadly as to transform these and other landlord-tenant disputes into constitutional questions, especially given the conspicuous absence of vessels and cargo owners from this case complaining about the fees they are paying at the Port of

19

New York and New Jersey.[8] Although the Tonnage Clause should be interpreted in light of its general purposes of preventing nullification of the Import-Export Clause and stopping states from obtaining geographic advantages by taxing vessels, these purposes do not give us license to transform the Tonnage Clause into something it is not and was never intended to be.

In sum, while we hold that the District Court should not have couched its conclusion in terms of standing after *Lexmark*, we agree with the District Court's essential holding: Maher, as a landside entity, is outside the Tonnage Clause's zone of interests. This is not, as Maher contends, to elevate form over substance. Anchoring the Tonnage Clause to taxes on vessels and their representatives is the only way to preserve the Clause's meaning. Accordingly, Maher failed to state a Tonnage Clause claim.

## B.

Maher next challenges the District Court's dismissal of its RHA claim. Under the RHA, taxes and fees from non-Federal interests (like the Port Authority) cannot be "levied upon or collected from any vessel or other water craft, or from its passengers or crew," except for, inter alia, "reasonable fees charged on a fair and equitable basis that –

---

[8] *State, Department of Natural Resources v. Alaska Riverways, Inc.*, 232 P.3d 1203 (Alaska 2010), is not to the contrary. There the Alaska Supreme Court struck down a per-passenger fee under the RHA that was assessed against a boat company ostensibly as rent for using unimproved shoreland. *Id.* at 1221. Unlike the plaintiff in that case, Maher is not a vessel operator so it does not have any independent interests protected by the Tonnage Clause or the RHA, its statutory equivalent.

20

(A) are used solely to pay the cost of a service to the vessel or water craft; (B) enhance the safety and efficiency of interstate and foreign commerce; and (C) do not impose more than a small burden on interstate or foreign commerce." 33 U.S.C. § 5(b).

By its terms, the RHA only applies to taxes and fees imposed on or collected from vessels, their passengers, or their crews. As a landside terminal, Maher is none of these and therefore cannot state a claim under the RHA. Maher itself recognizes that the RHA codifies the body of law surrounding the Tonnage Clause. Accordingly, we hold that Maher's RHA claim fails for the same reasons as its Tonnage Clause claim, and for the additional reason that the plain language of the RHA is explicitly limited to categories of entities that do not include Maher.

C.

We also reject Maher's argument that the District Court incorrectly dismissed its WRDA claim. The WRDA grants the consent of Congress to certain tonnage duties and cargo fees to finance harbor-improvement projects provided that such fees are imposed in accordance with the WRDA's requirements. 33 U.S.C. § 2236(a). Among other things, the WRDA permits the collection of fees only after the project has been completed. *Id.* § 2236(a)(1). Before fees may be imposed under the WRDA, there must be notice and a public hearing on the proposed fees, *id.* § 2236(a)(5), and the non-Federal interest must publicly file a schedule of harbor fees with the Federal Maritime Commission, *id.* § 2236(a)(6)(A). The WRDA allows "[a]ny person who . . . is . . . aggrieved by . . . a proposed scheme or schedule of port or harbor dues under this section . . . to seek judicial review of that proposed scheme or schedule," provided that the action is brought

21

within 180 days of the hearing required by § 2236(a)(5). *Id.* § 2236(b)(2).

Maher's WRDA claim fails for two reasons. First, the WRDA expressly applies only to fees imposed on vessels and on cargo. Here Maher is challenging neither. Granted, the Lease calculates Maher's rent based in part on the amount of cargo moving through Maher's terminal, but Maher's rent is not a fee on the cargo itself. Nor is it a tonnage duty, as explained above.

Second, we agree with the Port Authority that Maher has no WRDA claim because the Port Authority never even purported to impose rent on Maher pursuant to the WRDA. The WRDA provides a limited private right of action to persons "aggrieved by . . . *a proposed scheme or schedule of port or harbor dues under this section*" and only allows for "judicial review of *that proposed scheme or schedule*." *Id.* § 2236(b)(2) (emphasis added). Additionally, the 180-day time limit for bringing a WRDA claim is tied to the date of the public hearing required by the WRDA. *Id.* Because there is no WRDA schedule of fees for us to review, Maher has no WRDA claim.

Maher argues that such a reading of the WRDA is "preposterous," Maher Reply Br. 21, but we disagree. Nothing in the WRDA prohibits non-Federal interests from raising revenue in ways other than tonnage duties and cargo fees to finance harbor-improvement projects, as the Port Authority is allegedly doing in this case. Moreover, the WRDA merely provides congressional consent to tonnage duties and cargo fees that meet the WRDA's other requirements. In other words, it is a safe harbor for what would otherwise be unconstitutional duties. If a non-Federal interest imposes tonnage duties or cargo fees that do not comport with the WRDA's requirements, those duties and

fees would not have the consent of Congress, and the remedy would be a direct challenge under the Tonnage Clause or the Import-Export Clause.

Therefore, we hold that Maher cannot state a claim under the WRDA.

D.

Finally, we address Maher's negligence claim. The District Court concluded that it lacked federal admiralty jurisdiction over the claimYea, under 28 U.S.C. § 1333(1) and declined to exercise supplemental jurisdiction over the claim under 28 U.S.C. § 1367.

A proponent of admiralty jurisdiction for "a tort claim must satisfy conditions both of location and of connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). To satisfy the location test, "the tort [must have] occurred on navigable water or . . . [an] injury suffered on land [must have been] caused by a vessel on navigable water." *Id.* "[T]he tort occurs where the alleged negligence took effect." *Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 266 (1972) (internal quotation marks omitted).

Maher's claim of negligence is that the Port Authority "negligently establish[ed] and collect[ed] charges and fees for the use of Maher's terminal . . . upon such bases and in such amounts as are unlawful." J.A. 49. Put simply, any negligence by the Port Authority occurred on land. Maher and the Port Authority are land-based entities. The Lease was negotiated on land, and payments were made on land. Accordingly, Maher cannot satisfy the location test for admiralty jurisdiction, so its claim arises not under federal law but state law.

23

And because the District Court correctly dismissed all of Maher's federal claims over which it possessed original jurisdiction, the District Court did not abuse its discretion when it declined to exercise supplemental jurisdiction over Maher's state-law negligence claim. *See Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (discussing 28 U.S.C. § 1367(c)(3)).

### IV.

For the reasons set forth above, we will affirm the order of the District Court.[9]

---

[9] Based on our resolution of the case on the above-stated grounds, we do not reach the Port Authority's alternative arguments that Maher's claims are untimely.

*Maher Terminals, LLC v. The Port Authority of NY and NJ, et al.*, No. 14-3626

JORDAN, *Circuit Judge*, concurring in part and dissenting in part:

Although I concur in my colleagues' resolution of Maher's statutory and tort claims, I respectfully dissent from their conclusion that Maher has not stated a constitutional claim. The Majority Opinion runs contrary to a long line of Supreme Court precedent interpreting the Tonnage Clause. Most recently, in *Polar Tankers, Inc. v. City of Valdez, Alaska*, 557 U.S. 1 (2009), the Court reaffirmed its broad reading of that clause as prohibiting state and local governments from doing indirectly what they may not do directly, namely, lay a tax on shipping. *Id.* at 8. The Tonnage Clause forbids any attempt – "regardless of [its] name or form", *id.* – to raise revenue by charging duties on maritime commerce. That, however, is precisely what Maher alleges is the effect of the "Container Throughput Rental" assessments it must pay under the terms of its lease with the Port Authority. The assessments are a tax on the stevedores working with the vessels and will be passed on to the vessels, according to Maher. While those allegations may ultimately prove unfounded, I believe that Maher has pled sufficient facts to survive a motion to dismiss. I would therefore vacate the District Court's dismissal of the Tonnage Clause claim as to the Container Throughput Rental assessments.

The Constitution declares that "No State shall, without the Consent of Congress, lay any Duty of Tonnage … ." U.S. Const., art. I, § 10, cl. 3. My colleagues correctly note that the word "tonnage" literally refers to the "entire internal

cubical capacity, or contents of the ship or vessel expressed in tons of one hundred cubical feet … ." *In re State Tonnage Tax Cases*, 79 U.S. 204, 212 (1870). The term "'was used by the framers because at that day and time it was the customary mode of measuring the value of a ship.'" Erik M. Jensen, *Quirky Constitutional Provisions Matter: The Tonnage Clause, Polar Tankers, and State Taxation of Commerce*, 18 Geo. Mason L. Rev. 669, 683 (2011) (quoting Samuel Freeman Miller, Lectures on the Constitution of the United States 253 (photo reprint 1980) (New York & Albany, Banks & Bros. 1891)). But the Tonnage Clause has long since been extended to address taxation beyond the narrow reach inherent in that definition. It had to be, because, "taken in this restricted sense, the constitutional provision would not fully accomplish its intent." *So. Steamship Co. of New Orleans v. Portwardens*, 73 U.S. 31, 34 (1867). It was designed to support the Constitution's Import-Export Clause, which, as its name suggests, bars states from placing duties on imports or exports.[1] *In re State Tonnage Tax Cases*, 79 U.S. at 215 ("Tonnage duties are as much taxes as duties on imports or exports, and the prohibition of the Constitution extends as fully to such duties if levied by the States as to duties on imports or exports, and for reasons quite as strong

---

[1] The Import-Export Clause provides, "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress." U.S. Const. art. I, § 10, cl. 2.

as those which induced the framers of the Constitution to withdraw imports and exports from State taxation."). By its very nature, the Tonnage Clause also serves the fundamental purpose of the Commerce Clause,[2] ensuring federal control over matters of interstate and foreign commerce. *See Dept. of Revenue of State of Wash. v. Ass'n of Wash. Stevedoring Cos.*, 435 U.S. 734, 754 (1978). In fact, James Madison "was of the opinion that the commerce clause independently restrained the states from imposing duties of tonnage." *Plaquemines Port, Harbor & Terminal Dist. v. Fed. Mar. Comm'n*, 838 F.2d 536, 546 (D.C. Cir. 1988). Nonetheless, the Tonnage Clause was added to the Constitution and so provided, along with the Import-Export Clause, a set of bars to complement the Commerce Clause barricade against state meddling in matters of national and foreign commerce.[3] These three clauses in combination – the Commerce Clause, the Import-Export Clause, and the Tonnage Clause – are

---

[2] The Commerce Clause authorizes Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.

[3] By including the Tonnage Clause, certain delegates to the Convention worried that it "would imply the opposite [– that states could otherwise impose a tonnage duty –] and put the states in a worse position," *Plaquemines*, 838 F.2d at 546, but the Supreme Court has long rejected the notion that the absence of an express prohibition on states means that "any other commercial regulation, not expressly forbidden, to which the original power of the State was competent, may still be made," *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 200 (1824) (Marshall, C.J.).

meant to enhance the federal government's power to speak with one voice on matters of trade, to protect federal import revenues from state diversion, and to avoid discord among the states. *See Michelin Tire Corp. v. Wages*, 423 U.S. 276, 285-86 (1976).

The purposes meant to be accomplished by constitutional provisions, however, may not come easily or naturally. Self-interest is a powerful countervailing force. In the context of maritime commerce, that has manifested itself in repeated efforts by state and local authorities to circumvent the Tonnage Clause, often by merely calling a tax something else or moving the aim of it from a ship to a related target. The Supreme Court has been vigilant in recognizing and rejecting such creativity. "A State cannot take what would otherwise amount to a tax on the ship's capacity and evade the Clause by calling that tax 'a charge on the owner or supercargo,'[4] thereby 'justify[ing] this evasion of a great principle by producing a dictionary or a dictum to prove that a ship-captain is not a vessel, nor a supercargo an import.'" *Polar Tankers*, 557 U.S. at 8 (alteration in original) (quoting *Passenger Cases*, 48 U.S. (7 How.) 283, 459 (1849) (Grier, J., concurring)). Put differently, an indirect tax on shipping is just as offensive as a direct one. "The States cannot lay export duties, nor duties on imports, nor tonnage duties on vessels. If they tax the master and crew, *they indirectly lay a duty on the vessel.* If the passengers on board are taxed, *the*

---

[4] A "supercargo" is "[a] person specially employed and authorized by a cargo owner to sell cargo that has been shipped and to purchase returning cargo, at the best possible prices; the commercial or foreign agent of a merchant." Black's Law Dictionary 1575 (9th ed. 2009).

4

*protected goods – the imports – are reached.*" *Passenger Cases*, 48 U.S. at 452 (Catron, J., concurring) (emphasis added). The allegations in this case present only the latest example of a self-interested local authority trying to tax commerce.

In levying its assessment upon the landside marine terminal operator rather than the vessel or its representatives, the Port Authority is playing the exact labeling game that the Framers of our Constitution intended to foreclose by adopting the Tonnage Clause. The Port Authority is indirectly taxing vessels, and thus the goods on those vessels, by moving the locus of its assessments somewhere else, in this instance, to the water's edge. We ought not permit this. My colleagues accept the argument that "the Tonnage Clause was meant to protect vessels" (Majority at 15), which is true, as far as it goes. But the Clause was never meant simply to protect vessels as such. The Framers were not worried about boats. They were worried about provincialism and protecting national control of commercial activity so that there would be a free flow of goods between the states and with other nations.[5] They understood basic economics, including the

---

[5] The Majority's reasoning gains no traction by invoking the "zone of interests" test. In Commerce Clause cases, as the Majority recognizes, "we have advocated a liberal employment of the zone of interests test, explaining that it is not meant to be especially demanding." *Oxford Assocs. v. Waste Sys. Auth. of E. Montgomery Cnty.*, 271 F.3d 140, 146 (3d Cir. 2001) (internal quotation marks omitted). The bar of the "zone of interests" test is so low that it is satisfied by plaintiffs who merely "seek to vindicate interests *related to* the protection of interstate commerce." *Freeman v.*

5

way that indirect taxes on shipping would, if allowed, enrich coastal states at the expense of inland states. In the Federalist Papers, Alexander Hamilton noted that "[i]mposts, excises, and, in general, all duties upon articles of consumption, may be compared to a fluid, which will, in time, find its level with the means of paying them." The Federalist No. 21. The very fact that the Framers felt the Tonnage Clause was necessary as a backstop to the Import-Export Clause demonstrates their recognition of the illusory distinction between direct and indirect taxes on goods.

In the end, they knew, any charge on shipping – whether on the goods themselves, the vessels conveying the goods, or on some other surrogate for the vessels and goods – would be passed on to consumers. The citizens of one state

---

*Corzine*, 629 F.3d 146, 157 (3d Cir. 2010) (emphasis added). It would be odd, then, for the Tonnage Clause to have such a distinctly difficult "zone of interest" test, since the two clauses address the same concern.

In any event, the notion that Maher is not within the "zone of interests" of the Tonnage Clause is untenable. Maher's marine container terminal is the largest in the Port of New York and New Jersey, Maher unloads about one million ocean-shipping containers every year, and it paid $12.5 million in Container Throughput Rental assessments in 2010 alone. It is one of the world's largest multi-user marine container terminal operators, and has been operating at Port Elizabeth for over 60 years. The Tonnage Clause seeks to protect against local assessments that impose a charge on maritime trade. *Polar Tankers*, 557 U.S. at 8. Maher's position as a major stevedoring business is thus more than enough to satisfy the "zone of interests" test.

would benefit to the detriment of the citizens of another, and commerce would be impeded. According to Hamilton, "[t]he maxim that the consumer is the payer, is so much oftener true than the reverse of the proposition, that it is far more equitable that the duties on imports should go into a common stock, than that they should redound to the exclusive benefit of the importing States." The Federalist No. 35. Were such a tax on shipping permitted, whatever its guise, it would be "productive of inequality among the States; which inequality would be increased with the increased extent of the duties." *Id.* As a consequence, "the assumption of most founders was that … an indirect tax is one which the ultimate consumer can generally decide whether to pay by deciding whether to acquire the taxed product" – in other words, the assumption was that indirect taxes will get passed on to consumers in the form of higher prices. Erik M. Jensen, *The Apportionment of "Direct Taxes": Are Consumption Taxes Constitutional*, 97 Colum. L. Rev. 2334, 2395 (1997).

For that reason, when an assessment is a revenue-raising tax on the privilege of "entering, trading in, or lying in port," *Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n*, 296 U.S. 261, 265-66 (1935), and not a reasonable reimbursement for services rendered, it constitutes an impermissible duty of tonnage because it undermines federal control over commerce, regardless of the target of the assessment.[6] Hence, "[t]he prohibition of a duty of tonnage

---

[6] It bears mention that the Tonnage Clause is one of the few limitations of the Constitution that is not absolute but instead only disallows states from enacting such duties "without the Consent of Congress." U.S. Const., art. I, § 10, cl. 3. The Port Authority is thus free to seek an Act of

7

should … be construed so as to carry out [its] intent. A mere adherence to the letter, without reference to the spirit and purpose, may in this case mislead as it has misled in other cases." *Keokuk N. Line Packet Co. v. City of Keokuk*, 95 U.S. (5 Otto) 80, 87 (1877).

---

Congress permitting the fees at issue here. Indeed, the Water Resources Development Act itself is specifically styled as congressional consent to impose an otherwise-impermissible duty of tonnage. *See* 33 U.S.C. § 2236(a). Rather than foreclose all such taxes, the Tonnage Clause operates to move decision-making over duties of tonnage to Congress, thereby ensuring its control over matters of national commerce. The potential permissibility of such taxes, with congressional assent, makes plain "the necessity of a rigid adherence to the demands of" the Tonnage Clause. *Cannon v. City of New Orleans*, 87 U.S. (20 Wall.) 577, 583 (1874).

> If hardships arise in the enforcement of this principle, and the just necessities of a local commerce require a tax which is otherwise forbidden, it is presumed that Congress would not withhold its assent if properly informed and its consent requested. This is a much wiser course, and Congress is a much safer depositary of the final exercise of this important power than the ill-regulated and overtaxed towns and cities, which are not likely to look much beyond their own needs and their own interests.

*Id.* By upholding the assessment levied here, the Majority forecloses the need for cooperative federalism and instead permits the Port Authority to make the decision alone, without proper input from Congress.

Unfortunately, the Majority has been misled. The test it offers for distinguishing this case from those in which a Tonnage Clause violation was found is that the non-vessel targets of taxation in those cases – the captain, crew, passengers, etc. – were unlike the stevedores here because those targets were "representatives of ships" who "travel with the ships moving as vehicles in commerce." (Majority at 16.) According to the Majority, taxes on such people might "indirectly impact a vessel's decisions" as to how and where to travel. (*Id.*) But how can it be thought that the Container Throughput Rental assessments at issue here will not – in theory anyway – do the very same thing? Maher alleges that, at public cargo facilities, the Port Authority collects all fees and assessments from the vessels. By contrast, at leased cargo facilities like Maher's, the "Port Authority collects fees and charges … from the terminal operators, which in turn collect fees and charges from vessels and cargo using the terminals." (App. at 3.) In other words, vessels are charged directly at public facilities, and indirectly at leased facilities. According to the Majority, that amounts to a constitutional difference, with the Tonnage Clause acting as a restraint at the former set of facilities but not at the latter.[7] It is hard to

---

[7] In the case of the Cargo Facility Charge, the Port Authority actually requires that the "user of cargo handling services" (i.e., the vessels) pay charges "to the Port Authority", but the charge "will be collected by the terminal operator", like Maher, "for remittance to the Port Authority." (App. at 345.) In other words, Maher is nothing more than the collector of such charges directly on behalf of the Port Authority, and keeps none of the assessment for itself. Presumably, the Majority would have no problem with such a levy, even if it otherwise violated the Tonnage Clause,

accept that conclusion, since national and international commerce is happening at both types of facilities, and thus the concerns motivating the Framers are fully in play at both.

Of course, the Majority's distinction places Maher at a disadvantage in comparison with public cargo facilities – why would a ship avail itself of a Maher terminal subject to indirect taxes, when it can have access to public terminals where fees can only be charged for services rendered? And the size of Maher's disadvantage is now at the whim of the Port Authority, itself the owner of the competing public cargo facilities. By my colleagues' reasoning, though, that is of no moment. All the Port Authority needs to do to avoid the Tonnage Clause is insert a middleman between itself and the vessels to be taxed. If the Port Authority charges Maher fees for the privilege of stevedoring in its port, and Maher passes those fees on to the vessels, the vessels themselves have no Tonnage Clause claim against the Port Authority because their payments, nominally paid to Maher, would not be considered taxes. And the vessels could not sue Maher for a Tonnage Clause violation, as it is not a sovereign entity. Only Maher can vindicate the Tonnage Clause interests at stake here. But, to the Majority, the Tonnage Clause becomes a dead letter once a landside middleman is inserted. If the Port Authority wants to raise some extra revenue, it can do exactly that – with this Court's blessing. That result effectively ignores the Supreme Court's injunction that "the prohibition against tonnage duties … embrace[s] *all* taxes and duties *regardless of their name or form … which operate to impose a charge for the privilege of entering, trading in, or*

---

because the money first passed through the hands of the terminal operator.

10

*lying in a port.*" *Polar Tankers*, 557 U.S. at 8 (emphasis added) (internal quotation marks omitted).

The scope of constitutional protection should not be controlled by the fact that stevedoring services take place on land as well as on vessels. The Supreme Court has specifically commented on the necessity to maritime commerce of the work done by stevedores:

> Transportation of a cargo by water is impossible or futile unless the thing to be transported is put aboard the ship and taken off at destination. *A stevedore who in person or by servants does work so indispensable is as much an agency of commerce as shipowner or master.* Formerly the work was done by the ship's crew; but, owing to the exigencies of increasing commerce and the demand for rapidity and special skill, it has become a specialized service devolving upon a class as clearly identified with maritime affairs as are the mariners.

*Puget Sound Stevedoring Co. v. Tax Comm'n of Wash.*, 302 U.S. 90, 92 (1937) (emphasis added) (internal quotation marks omitted), *overruled by Dept. of Revenue of Wash. v. Ass'n of Wash. Stevedoring Cos.*, 435 U.S. 734 (1978).[8] The

_____

[8] In *Puget Sound*, the Supreme Court struck down the State of Washington's effort to impose a business tax on a stevedoring company as a violation of the Commerce Clause. 302 U.S. 90 (1937). The Court reasoned that, because "[t]he business of loading and unloading" ships constitutes interstate commerce, Washington was *per se* not permitted to impose

11

Supreme Court has thus already disavowed the distinction that today's Majority draws. "What is decisive is the nature of the act, not the person of the actor." *Id*. at 94. *Cf. Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 288 (1977) ("[A] focus on that formalism merely obscures the question whether the tax produces a forbidden effect.").

The *Passenger Cases* best bear out the point. One of the cases at issue there involved a two-dollar-per-passenger assessment, levied on the "master, owner, consignee, or

---

its tax. *Id*. at 94. When Washington again tried to tax stevedores in 1974, the Supreme Court reconsidered and overruled its holding in *Puget Sound*. *See Dept. of Revenue of Wash. v. Ass'n of Wash. Stevedoring Cos.*, 435 U.S. 734 (1978). In changing the applicable law, the Supreme Court did nothing to alter its admonition in *Puget Sound* concerning the importance of stevedores in maritime commerce. In the later case, the Supreme Court reasoned that a tax on interstate commercial activity does not offend the Commerce Clause when the tax "applied to activity with a substantial nexus with the State, that are fairly apportioned, that do not discriminate against interstate commerce, and that are fairly related to the services provided by the State." *Id*. at 750. In light of this new, fact-intensive approach to challenges to state taxation under the Commerce Clause, the Court ultimately upheld the Washington tax at issue because "respondents relied below on the *per se* approach of *Puget Sound* and … [therefore] they developed no factual basis on which to declare the Washington tax unconstitutional as applied to their members and their stevedoring activities." *Id*. at 751. In neither *Puget Sound* nor *Dept. of Revenue of Washington* did the Court consider the scope or applicability of the Tonnage Clause.

agent" of any vessel landing in the port of Boston, which had to be paid before any passengers could disembark. *Passenger Cases*, 48 U.S. (7 How.) at 456. The Supreme Court declared, by a five-to-four vote, that the tax was unconstitutional. *Id.* at 573. But with eight justices writing separately, the rationale of the Court was left unclear. Four justices relied on the Tonnage Clause, including Justice Grier, who concluded that it did not matter whether the tax was viewed as "a tax upon passengers or persons," or as a tax upon vessels. *Passenger Cases*, 48 U.S. (7 How.) at 460 (Grier, J., concurring). He persuasively discussed why such a distinction inevitably breaks down:

> It has been argued that this is not a tax on the master or the vessel, because in effect it is paid by the passenger having enhanced the price of his passage. Let us test the value of this argument by its application to other cases that naturally suggest themselves. If this act had, in direct terms, compelled the master to pay a tax or duty levied or graduated on the ratio of the tonnage of his vessel, whose freight was earned by the transportation of passengers, it might have been said, with equal truth, that the duty was paid by the passenger, and not by the vessel. And so, if it had laid an impost on the goods of the passenger imported by the vessel, it might have been said, with equal reason, it was only a tax on the passenger at last, as it comes out of his pocket, and, graduating it by the amount of his goods, affects only the modus or ratio by which its amount is calculated. In this way, the most stringent enactments may be

13

easily evaded. *It is a just and well-settled doctrine established by this court, that a State cannot do that indirectly which she is forbidden by the Constitution to do directly. …* The Constitution of the United States, and the powers confided by it to the general government, to be exercised for the benefit of all the States, ought not to be nullified or evaded by astute verbal criticism, without regard to the grand aim and object of the instrument, and the principles on which it is based.

*Passenger Cases*, 48 U.S. (7 How.) at 458-59 (Grier, J., concurring) (emphasis added).[9] Thus the necessary breadth of the Tonnage Clause.

---

[9] More recently, the Second Circuit adhered to this principle in *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, in holding that a passenger fee violated the Tonnage Clause. 567 F.3d 79, 88 (2d Cir. 2009). The amount of the passenger fee varied depending upon whether the passenger was a person, a car, a truck, or a bus. *Id.* at 83. Although the passenger fee was collected from passengers by the ferry company and thereafter remitted to the state, the state reimbursed the ferry company with an administrative fee for its trouble. *Id.* The *Bridgeport* Court correctly referred to the passengers as the fee payers, *id.* at 88, as the fee was ultimately passed on to passengers in the form an increase in ticket prices. Even though the fee represented a small percentage of overall ticket prices – in 2005 a one-way ferry ticket for a vehicle with unlimited passengers was $51.25, while the corresponding passenger

Justice Grier's expansive reading of the Tonnage Clause has since acquired dispositive weight with the endorsement of his position by the Court in *Polar Tankers*. *See Polar Tankers*, 557 U.S. at 8. Despite that, my colleagues apply an unduly restrictive reading to the *Polar Tankers* decision. According to them: "What actually made the tax in *Polar Tankers* unconstitutional, and what Maher cannot show here, is that the tax was directed at vessels and was not in exchange for services." (Majority at 20.) But that is not what the Supreme Court said. Far from limiting its reasoning to duties laid on vessels, the Supreme Court reiterated that the "prohibition against tonnage duties has been deemed to embrace all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port." *Polar Tankers*, 557 U.S. at 8 (internal quotation omitted). It would be hard to find more sweeping language than the words "regardless of their name or form" to describe the prohibited taxes, and likewise the words "entering, trading in, or lying in a port" seem intended to capture all trade-related activities in port.[10] *Id.* The Majority's restrictive reading of *Polar*

---

fee was \$2.75, *id.* at 83 – the Second Circuit recognized that such a fee charged to passengers, with no corresponding benefit to them, was impermissible under the Tonnage Clause.

[10] My colleagues warn that, if we unmoor the Tonnage Clause from taxes on vessels, then landside entities having some relationship to maritime commerce would be able to challenge any unreasonable state-imposed fees for the privilege of doing business at a port. For example, they say, a restaurant renting state property in a port could state a claim

*Tankers* is at odds with the reasoning and language of the decision itself.

Although the present case involves a cargo throughput assessment levied on a stevedoring operation, conceptually, there is no difference between that and the fee levied in the *Passenger Cases*.[11]  The Port Authority is "'do[ing] that indirectly which [it] is forbidden ... to do directly,'" evading

under the Tonnage Clause by claiming that its rent is unreasonably high given the services provided by the state. That hypothetical misses the mark by a wide margin.  To begin with, a rental fee is clearly reimbursement for a service rendered: providing the property on which the lessee can conduct its business.  Further, unlike the restaurateur from the Majority's hypothetical, Maher does not have merely some tenuous relationship to maritime commerce.  Maher is directly engaged in it.  As the Supreme Court recognized in *Puget Sound*, such commerce could not occur without stevedores like Maher to load and unload seaborne cargo. The faithful construction of the Tonnage Clause that I propose will not, as the Majority fears, encompass disputes unrelated to volumetric charges.  It will, instead, avoid arbitrary line-drawing that forecloses claims by entities that are clearly within the Tonnage Clause's zone of interest.

[11] The Majority implicitly recognizes as much.  It announces that the Tonnage Clause applies to taxes on passengers because such duties "will likely *indirectly* impact a vessel's decisions by reducing demand," but then, inconsistently, says that the Clause does not apply to a fee on Maher because such a fee "does not *in and of itself* impact a vessel's ability to freely navigate in commerce."  (Majority at 16.)

the Tonnage Clause "'by producing a dictionary or a dictum to prove that a [marine terminal operator] is not a vessel, nor a [stevedore] an import.'" *Polar Tankers*, 557 U.S. at 8 (quoting *Passenger Cases*, 48 U.S. (7 How.) at 458, 459 (Grier, J., concurring)).[12]

---

[12] While I dissent from my colleagues' narrow reading of the Tonnage Clause, I have no disagreement with their conclusion that the Basic Rental assessment does not violate that constitutional provision. The Basic Rental assessment, unlike the Container Throughput Rental, is more properly considered a fee for services rendered than a revenue-raising tax. The Port Authority owns the marine terminal and is entitled to "just compensation for the use of such property." *Cannon*, 87 U.S. (20 Wall.) at 582. Although the Basic Rental constitutes a fee for services, on the facts alleged by Maher, the Container Throughput Rental does not. According to Maher's complaint, the fees charged in the Container Throughput Rental "substantially exceed the costs of services provided by the Port Authority to the cargo or vessels" and "escalate at two to three year intervals without corresponding increases in the level of services provided by the Port Authority to the cargo or vessels." (App. at 42.) The fees are used to "subsidize other terminals" and "for other purposes not benefiting the vessels and cargo that use Maher's container terminal, including but not limited to, expenses to purchase and develop marine terminals for vessels that do not or cannot use Maher's container terminal." (App. at 44.) Also, the Container Throughput Rentals vary by the volume of cargo that is loaded and unloaded at Maher's terminal – thus striking at the very heart of the concerns motivating the Tonnage Clause – while any services provided do not. Maher pays a higher Container Throughput Rental

In sum, the Majority errs in giving the Tonnage Clause a singularly narrow reading, and I would reverse the portion of the District Court's order that is based on that same errant view of the Constitution.

---

the more cargo it unloads, and, according to its Complaint, receives nothing from the Port Authority in return.

To the extent the District Court held that "most (if not all) of the rental charges and fees imposed by Port Authority against Maher would likely be the type of charges for services rendered that fall outside the Tonnage Clause's scope" (App. at 12-13 (internal quotations omitted)), it did not view the facts in the light most favorable to and draw all reasonable inferences in favor of Maher. In its Complaint, Maher repeatedly emphasized the disconnect between the amount paid and the services rendered, but the District Court did not adequately credit Maher's assertions.